712 A.2d 1245

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. BRIAN GREEN, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted May 13, 1998—Decided June 30, 1998.

Before Judges BAIME and BROCHIN.

*Ivelisse Torres,* Public Defender, attorney for appellant (*Michele A. Adubato,* Designated Counsel, on the brief).

*Patricia A Hurt,* Essex County Prosecutor, attorney for respondent (*Barbara A. Rosenkrans,* Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Defendant Brian Green was convicted of possession of heroin (*N.J.S.A.* 2C:35–10a(1)); possession of heroin with the intent to distribute it (*N.J.S.A.* 2C:35–5b(3)); and possession of heroin within 1000 feet of school property (*N.J.S.A.* 2C:35–7). The three convictions were merged and he was sentenced to five years' imprisonment with three years' parole ineligibility.

Defendant has appealed. He argues that he was deprived of his constitutional right to effective assistance of counsel because his

trial attorney did not move to suppress the heroin which was offered as evidence against him. Defendant also contends that he is entitled to a new trial because the prosecutor cross-examined him about whether he asked for an attorney when he was arrested and implicitly argued during her summation that the grand jury's indictment was a reason for returning a verdict of guilty. Alternatively, defendant asserts that his sentence is excessive.

Defendant was arrested during a police "sweep" in the area of West Kinney Street in Newark at approximately one o'clock in the afternoon of June 7, 1994. A marked patrol car had driven through the neighborhood five or ten minutes earlier and had reported a lot of "activity," presumably suspected narcotics sales. Similar sweeps were conducted approximately three times a week in neighborhoods reported to be "high crime area[s]."

"Minutes" ahead of the sweep, a marked police car drove through the neighborhood, announcing through a loudspeaker that "anyone loitering in the area must leave that area." (By "loitering," the police meant "milling around, standing around," and being unable to "justify why they're there.") Then twelve to fourteen police officers, not in uniform but wearing sweat shirts with police insignia on the front and back, arrived in the area simultaneously in five or six unmarked police cars. Their purpose was to "challenge all the people who are standing around to find out if they belong there or not" and to deter them from "loitering." It was not intended "to get any particular individual who was reported[ ] to be involved with crime; it was basically to clean out the block from people hanging around." The police would attempt to ascertain the identities of any such persons and determine whether there were any warrants outstanding for their arrest. Sometimes, persons living in the neighborhood where a sweep was conducted complained that they would get caught up in it if they happened to be walking to a nearby store.

Newark Detective Omar Abdul Akim, who participated in the sweep, was one of the police officers who testified for the State. When Detective Akim and the two other police officers who were

working with him arrived at 342 West Kinney Street, fifteen or twenty persons other than policemen were in the area. Someone yelled, "Five–O" to warn that the police had arrived. The "sweep" force arrested two or three persons, and the rest ran or walked rapidly into a nearby building and disappeared.

Defendant attracted the attention of Officers Hubert Clark and Frank Bristol because he was one of many persons who tried to run away when the police were spotted. Detective Akim and Officers Clark and Bristol ran after him. Detective Akim did not notice defendant until the other policemen had begun chasing him, and then he joined the chase. The police do not appear to have known or recognized defendant until after he was arrested.

During direct examination of Detective Akim, the prosecutor asked him, "Did you identify yourselves as police officers." The detective answered, "Yes." The context of the question indicates Detective Akim meant that this "identification" occurred while the officers were chasing defendant and he was running away. The prosecutor inquired, "Did he continue to run?" The detective answered, "Yes."

While Detective Akim was running after defendant, the detective noticed that defendant was holding the waistband of his pants and Officer Clark saw defendant take something from his waistband and throw it away. Detective Akim retrieved a brown paper bag containing glassine envelopes with heroin in them. He identified the bag and its contents as having been discarded by defendant during the chase. Officers Clark and Bristol caught defendant and arrested him. He did not have any incriminating evidence still in his possession.

While cross-examining defendant, the prosecutor asked him the following questions and received the following replies:

Q. Did you ever ask for a lawyer when you were arrested?

A. No.

Q. You had been arrested before. Isn't that correct?

A. Yes.

Q. So you knew you had a right to have an attorney. Isn't that correct?

A. Yes.

Q. You didn't ask for one?

A. No.

During her opening statement to the jury, the prosecutor said:

I would also like to inform you the reason we are here is because of this indictment.

This indictment is brought to this courtroom today because a few months ago a Grand Jury sat—which had consisted of 23 members. Their job was to listen to the case which the Prosecutor's Office presented to them, and by a majority of votes of the 23 members, to determine whether or not there was enough probable cause to place an indictment against the defendant, and they did that, and that's why we are here today.

She then read the indictment.

During summation, the prosecutor said:

I told you [y]esterday that the reason that we were here was because of this indictment, and I told you that this indictment was our admitting ticket in this courtroom because 23 people sitting as Grand Jurors sometime during the year of 1994 stated there was enough probable cause to have a true bill against the defendant regarding these charges.

Defendant objected, but the court declined to give the jury any admonitory instructions at that time. During the general charge, however, the court told the jurors:

Please remember, ladies and gentlemen, this indictment is not evidence of Mr. Green's guilt. It is merely a formal charge, an informal pleading reflecting a step in the proceedings to bring this matter before a Court and a jury such as yourselves for a final decision.

We cannot conceive what the prosecutor thought the relevance might be of whether defendant had requested an attorney when he was arrested and whether he knew he was entitled to an attorney because he had been arrested previously. Insofar as we can see, the only significance of these questions was to emphasize to the jury that defendant had previously been arrested. The prejudice which these questions might otherwise have caused is mitigated because defendant conceded in answer to proper questions from the prosecutor that he had previously been convicted of a third-degree crime. Nonetheless, they were entirely improper. Cf. *State v. Johnson*, 65 *N.J.* 388, 391–92, 323 *A.*2d 450 (1974) (improper for prosecutor to use cross-examination of

defendant solely for purpose of reviewing defendant's criminal record where defendant disclosed on direct all of his prior convictions).

■ The prosecutor's references during her summation to the actions of the grand jury were also improper. It is customary for the indictment to be read to the jurors at the beginning of the trial, for the jurors to be told that their duty will be to decide at the conclusion of the trial whether the charges have been proved beyond a reasonable doubt, and for them to be cautioned that the indictment is not evidence of guilt. *See, e.g.,* 32 *New Jersey Practice, Criminal Practice and Procedure* § 974, at 374 (Leonard N. Arnold) (Supp.1997); *see also State v. Vigliano,* 43 *N.J.* 44, 60, 202 *A.*2d 657 (1964) (as part of charge, judge read indictment to and instructed jury that "indictment had no probative value on the issue of guilt or innocence"); *cf. Johnson, supra,* 65 *N.J.* at 391, 323 *A.*2d 450 ("[T]rial court's instructions to jury as to the import and force of an indictment . . . were not only improper but possessed the clear capacity to prejudice defendant by suggesting to the jury that an indictment of itself constitutes a *prima facie* finding by a Grand Jury as to defendant's guilt."); *State v. Goode,* 278 *N.J.Super.* 85, 90, 650 *A.*2d 393 (App.Div.1994) (improper taint of jury by prosecutor's comments about success of police in obtaining search warrant based on probable cause because comment would lead jury to conclude defendant was guilty). But whatever the prosecutor's intention may have been, arguing that the grand jury had found "enough probable cause to have a true bill against the defendant regarding these charges" implied that the grand jury's indictment was a consideration which should influence them to convict. That implication is wrong and potentially prejudicial to the rights of the defendant, particularly in this case where the number of people scurrying about and the confusion attendant on the sweep were capable of raising at least some question about Detective Akim's identification of defendant as the person who dropped the bag of heroin. *Cf. Goode, supra,* 278 *N.J.Super.* at 92, 650 *A.*2d 393 ("[R]epeated improper comments,

which ran as a thread through this trial, from opening to summation, rise to the level of plain error, for they have 'a clear capacity to bring about an unjust result and ... substantially prejudiced the defendant's right to have the jury fairly evaluate the merits of his defense.' ") (citation omitted).

The court's instruction that the indictment was not evidence was too general to dissipate the harm. It did not adequately counter the suggestion implicit in the prosecutor's argument that the considered opinion of the grand jury was entitled to the trial jurors' deference. *Cf. State v. Cofield,* 127 *N.J.* 328, 341–42, 605 *A.*2d 230 (1992) (failure of generalized instruction to cure prejudicial impact of other-crime evidence was error); *State v. Slattery,* 239 *N.J.Super.* 534, 552–53, 571 *A.*2d 1314 (App.Div.1990) (jury instruction about appellate review was improper because it "tended to dilute the jury's sense of responsibility" for deciding defendant's guilt). This misleading suggestion requires us to order a new trial.

We cannot tell with any assurance from the present record whether a timely motion to suppress would have prevailed. The legality of Detective Akim's seizure of the brown paper bag which he testified defendant threw away while he was running from the police depends on whether this case is controlled by *State v. Tucker,* 136 *N.J.* 158, 642 *A.*2d 401 (1994), in which the seizure of evidence discarded during a chase was suppressed, or by *State v. Ruiz,* 286 *N.J.Super.* 155, 668 *A.*2d 460 (App.Div.1995), *certif. denied,* 143 *N.J.* 519, 673 *A.*2d 277 (1996), and *State v. Doss,* 254 *N.J.Super.* 122, 603 *A.*2d 102 (App.Div.), *certif. denied,* 130 *N.J.* 17, 611 *A.*2d 655 (1992), in which we affirmed denials of motions to suppress evidence seized during warrantless police chases.

*Ruiz, supra,* discusses the critical difference between that case and *Doss, supra,* on the one hand and *Tucker, supra,* on the other. *Ruiz, supra,* 286 *N.J.Super.* at 159–62, 668 *A.*2d 460. *Ruiz, supra,* points out that, insofar as appeared from the stipulated facts on which *Tucker, supra,* was decided, the only reason the police had for chasing the suspect was that he ran away when they

approached. *Id.* at 161, 642 *A.*2d 401. *Tucker, supra,* notes that in *Doss, supra,* twenty people were gathered at eleven o'clock on a November night in a parking area where drug trafficking was known to be prevalent. *Tucker, supra,* 136 *N.J.* at 170, 642 *A.*2d 401. Someone in the crowd warned them that police were approaching. *Ibid.* Three or four persons, including the defendant, ran from the crowd. *Ibid.* The police followed the defendant. *Ibid.* A police detective repeatedly commanded the defendant to halt. *Ibid.* The detective pursuing defendant recognized him as someone he had seen talking to drug dealers on several previous occasions. *Ibid.* According to *Tucker, supra,* these facts justified pursuing and stopping Doss and seizing the drugs he was found to be carrying. *Ibid.*

In *Ruiz, supra,* a policeman in an unmarked police car saw the defendant walking near the center of the roadway at about eleven o'clock at night in a residential area where people were known to go to buy and sell drugs. 286 *N.J.Super.* at 157, 668 *A.*2d 460. The policeman drove alongside the defendant and stopped. *Ibid.* The policeman and the defendant immediately recognized each other. *Ibid.* The policeman knew that the defendant had been arrested several times for drug related offenses. *Ibid.* The defendant uttered an expletive and immediately turned and ran. *Ibid.* These facts, too, were held to justify the police in pursuing him and retrieving the drugs he discarded during the chase. *Id.* at 158, 163, 668 *A.*2d 460.

The police action in the present case, like those in *Doss* and *Ruiz,* occurred in an area where drug trafficking was prevalent. Like the defendants in *Doss* and *Ruiz,* defendant Green ran when the police arrived. Like *Doss,* but unlike *Ruiz,* the police did not recognize defendant Green before they started to chase after him. Unlike both of those other cases, the police action in the present case took place during the daytime. In both *Doss* and *Ruiz,* the totality of the circumstances supported an "articulable suspicion" on the part of the police which, though less than probable cause to arrest, authorized them to stop the fleeing suspects and to interro-

gate them. Acting on that "articulable suspicion," the police in each of those cases shouted to their suspect, "Stop, police!" The defendant's disobedience of those orders to stop justified their stopping him and seizing the drugs which he was carrying or had thrown away.

The record in the present case does not show that the police ordered Green to stop. In answer to a leading question from the prosecutor, Detective Akim agreed that he and the two other policemen who were pursuing defendant "identif[ied] [themselves] as police officers." Perhaps that means that the police shouted to Green that they were police. Perhaps the question and answer imply that, besides merely identifying themselves, the police ordered Green to stop. Perhaps, however, Detective Akim was only referring to the police department insignia printed on the front and back of the sweatshirts they were wearing. We cannot be sure.

■ Our recital of the facts relevant to defendant's suppression motion was based on the trial itself. The parties saw no reason to focus on issues relevant only to the suppression of evidence, and the trial court had no occasion to make any findings with respect to whether the heroin introduced into evidence was legally retrieved because no motion was made to exclude it. Consequently, whether the police ordered Green to stop, and perhaps other significant facts as well, were left in doubt. Therefore, the present record affords us an inadequate basis on which to decide whether a motion to suppress evidence would have been granted if it had been made. However, since we have ordered a retrial on other grounds, defendant will have the opportunity for a timely motion in advance of trial to suppress the evidence against him.

■ There is one other issue which we will mention because it is potentially significant for this and other cases, but which we will not attempt to decide because it has not been raised by either of the parties and it is unnecessary to our present decision. That is the issue whether the sweep itself was legal. It is well settled that a group of persons cannot be arrested or dispersed merely for

"loitering" if they are not engaged in any illegal activity. *See Papachristou v. City of Jacksonville*, 405 *U.S.* 156, 158–60, 162, 168–69, 92 *S.Ct.* 839, 841–42, 843, 846–47, 31 *L. Ed.*2d 110, 113–14, 115, 119 (1972); *Shuttlesworth v. City of Birmingham*, 382 *U.S.* 87, 90–91, 86 *S.Ct.* 211, 213, 15 *L. Ed.*2d 176, 179 (1965); *Camarco v. City of Orange*, 61 *N.J.* 463, 464–66, 295 *A.*2d 353 (1972); *State v. Caez*, 81 *N.J.Super.* 315, 319, 195 *A.*2d 496 (App.Div.1963). The unanswered question in this case is whether the suspicion on the part of the police, which may have been well founded but which they were not prepared to prove, that the people gathered on West Kinney Street were engaged in illegal activities justified ordering them to disperse and, immediately afterwards, interrogating those who remained to ascertain their identities.

Our order for a new trial moots defendant's argument that his sentence is excessive.

The judgment appealed from is reversed and the case is remanded for further proceedings consistent with this opinion.