No. 91,324

In the Matter of the Care and Treatment of RANDY FOSTER, *Appellant.*

(127 P.3d 277)

Opinion filed February 3, 2006.

*Jessica R. Kunen,* of Lawrence, argued the cause and was on the brief for appellant.

*Nola F. Wright,* assistant attorney general, argued the cause, and *Phill Kline,* attorney general, was with her on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: Randy Foster appeals from a jury finding that classified him as a sexually violent predator and the resulting involuntary commitment to the Larned State Security Hospital. A split Court of Appeals affirmed in *In re Care & Treatment of Foster,* 33 Kan. App. 2d 717, 107 P.3d 1249 (2005). This court granted Foster's petition for review under K.S.A. 20-3018(b).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the assistant attorney general commit reversible misconduct in her opening statement? Yes.
2. Did the district court err in admitting the entire Hospital report on Foster as an exhibit? Yes.
3. Did the district court err in instructing the jury on issues relating to the commitment, treatment, and possible release of Foster? No.

Accordingly, we reverse.

## FACTS

On or about February 3, 2003, the State of Kansas filed a petition in Douglas County District Court pursuant to the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 59-29a01 *et seq*, The petition alleged that Randy Foster was a sexually violent predator as defined by that statute and should be involuntarily committed for treatment. After a hearing on March 10, 2003, the district court found probable cause to believe that Foster met the sexually violent predator criteria.

Based on the district court's finding, Foster was admitted to the Larned State Security Hospital (Hospital) on March 19, 2003, for an evaluation pursuant to the KSVPA. The Hospital's evaluating clinicians found that Foster qualified as a sexually violent predator. The Hospital's 25-page report was filed with the district court in April 2003.

A jury trial commenced 5 months later on September 19, 2003. During the opening statement, counsel for the State commented on the events leading up to the jury trial. She told the jury that Foster's case was reviewed by a "committee called a multidisciplinary team" that reviewed Foster's records, as well as his social and criminal history, and thereafter made a determination as to whether he was at risk to reoffend. Counsel explained that the case was passed on to a "prosecutor's committee" composed of several attorneys who made a determination based on the records and psychologists' opinions as to whether Foster was at risk to reoffend. Counsel told the jury that afterward, a probable cause hearing was

held where a judge found enough evidence to go forward under the KSVPA.

Two witnesses testified for the State: Rex Rosenberg, a licensed master's level psychologist and licensed clinical psychologist at the Hospital, and J.L.L. Fernando, M.D., a board-certified psychiatrist at the Hospital. Foster called no witnesses and put on no evidence, electing to force the State to simply make its case. He also made only two objections: to the admission of the Hospital report and to a jury instruction, as explained later in the opinion.

Rosenberg testified first, as follows.

When the assistant attorney general asked about the screening process respondents go through, Rosenberg responded:

"A: Well, before they leave the prison system, the clinical services evaluation is completed by clinicians in that system and then [1] the information on each person who has been convicted of and incarcerated for a sex offense goes along to the multidisciplinary team. They do a review of the information and make a determination whether they see the person as a high risk to offend, and then [2] the information goes along to the prosecutor's review committee and that group reviews it and then if that group decides to proceed, the next step is [3] the probable cause hearing; and if the person makes it through all of those steps, the final step would be an order to the state security hospital for this evaluation."

Rosenberg participated in the evaluation of Foster and prepared the 25-page Hospital report with Dr. Fernando. He testified regarding his evaluation of Foster, including the procedure utilized and the documents and literature he relied upon. Rosenberg interviewed Foster for approximately 6 hours and 20 minutes and testified at length about Foster's history of sexual behavior and sexual offenses.

Foster informed Rosenberg that when he was 5 years old, he was molested by a 12-year-old boy. At the same age, Foster's father forced anal sex upon him. Foster admitted to Rosenberg that when he was 14 years old, his 4-year-old niece performed oral sex on him. Afterwards, he forced her to engage in anal sex.

Between the ages of 16 and 42, Foster had sexual contact with 15 adult women of roughly the same age. Foster married five of these women.

In 1985, Foster was charged in Texas with indecency with a child based on allegations of sexual intercourse with a 7-year-old girl. When asked about the incident, Foster stated that he had been charged with sexual assault, but that the witnesses failed to appear. Foster spent 6 months in prison, but was later released.

From 1986 to 1989, Foster was married to a woman in Montana. He was charged with sexually molesting her two young girls. Foster acknowledged that it was possible the allegations were true.

In 1993, Foster was convicted of two counts of aggravated incest for acts of oral sex and fondling involving two minor females, ages 4 and 6. He was married to the victims' mother at the time. Also in 1993, Foster was convicted of attempted aggravated sexual battery for incidents of sexual contact with a young girl who was a friend of his oldest stepdaughter.

Foster told Rosenberg that after he began having sexual fantasies about his stepdaughters, he initiated wrestling in order to touch them vaginally. He eventually masturbated the girls and had them masturbate him and perform oral sex on him. Foster also acknowledged that he penetrated the older girl with his penis. He felt justified in molesting the girls because he learned that they had been molested by their father.

Although Foster acknowledged several instances of sexual behavior with minors, he told Rosenberg that he did not believe he was a danger to children anymore. Rosenberg testified, however, that he believed Foster viewed young girls as sex toys and was aroused by them. According to Rosenberg, Foster thought he was merely teaching the girls to be better sex partners. Rosenberg did not believe Foster showed remorse for his past actions. While Rosenberg thought that Foster was candid during some of the interview, he also believed that Foster omitted information at times.

In 1994, Foster completed a sex offender treatment program in prison. Further, as a condition of his parole in 1998, Foster was required to successfully complete an outpatient sex offender aftercare program. Although he participated in the program for 2 years, he was eventually terminated from the program for lack of progress. Due to his lack of progress in the program, Foster's parole was revoked in August of 2000.

Foster was able to identify for Rosenberg several high-risk situations that might cause relapse, including being around nude children, being alone with girls, attending strip clubs, consuming alcohol, viewing pornography, and looking for single parents. Although Foster identified the risk factors, Rosenberg felt that Foster's termination from the outpatient sex offender program indicated Foster's inability to grasp the necessary skills to prevent reoffending.

Several tests were administered to Foster, including the Minnesota Multiphasic Personality Inventory (MMPI) and the Minnesota Sex Offender Screening Tool. The MMPI indicated that Foster's prognosis is "guarded," because he expects others to change to meet his expectations and he rarely engages in serious examination of his own behavior. The MMPI results showed Foster to be

"angry, belligerent, rebellious, resentful of rules and regulations, and hostile toward authority figures. He is likely to be impulsive, unreliable, egocentric, and irresponsible. He often has little regard for social standards and often shows poor judgment and seems to have difficulty planning ahead and benefitting from previous experiences. He makes a good first impression, but long term relationships stand to be rather superficial and unsatisfying."

The Minnesota Sex Offender Screening Tool found Foster's risk for reoffending was moderate, or a 45 percent risk of recidivism within 6 years. The risk percentage only estimated the chance of Foster being arrested again, however, and not the chance of a sexual act occurring. Foster was found to have a moderate range of risk for offending, or a score of 5, based on a score of 1 to 13, with 1 being the lowest.

Based on criteria from the Diagnostic and Statistical Manual of Mental Disorders, 4th edition (DSM-IV), Rosenberg testified that Foster's diagnosis was (1) pedophilia, sexually attracted to females, nonexclusive type; (2) antisocial personality disorder with narcissistic features; and (3) alcohol dependence, in full sustained remission in a controlled environment. Rosenberg opined that the diagnosis of pedophilia, coupled with the antisocial personality disorder, increased the chance that Foster will reoffend because of his disregard for others and societal standards, and his impulsivity.

Ultimately, Rosenberg concluded that Foster is likely to engage in repeated acts of sexual violence because Foster has difficulty controlling his sexually deviant behavior.

The State moved to admit the 25-page report signed by Rosenberg, Fernando, and Mayda Nel Strong, Ph.D., a licensed psychologist/reviewer, which stated "these examiners conclude that Mr. Foster meets the criteria to be considered a sexually violent predator in the State of Kansas at this time." Foster objected on the basis that the report was cumulative because Rosenberg's testimony covered the same information. The district court admitted the report, finding that the testimony was so lengthy that the jurors might need the report to refresh their memory.

Dr. Fernando then testified that he interviewed Foster and reviewed his records. Dr. Fernando agreed with the report prepared by Rosenberg. Consistent with the report, he testified that he believed Foster is at risk to reoffend and would benefit from long-term treatment.

During the State's closing, the assistant attorney general stated:

"[A]s I told you in my opening statement and as I think the evidence has shown to you, *this man has gone through many levels of reviews*: when he was first incarcerated, he was reviewed and analyzed and diagnosed by the Kansas Department of Corrections psychiatric evaluations as a pedophile. Before he was released on parole again, pedophile, and [he] comes back in the system and is reviewed again: 'Pedophile.' Not making progress or doing what he is supposed to do." (Emphasis added.)

After the jury found Foster to be a sexually violent predator, the court committed him to the custody of the Secretary of the Department of Social and Rehabilitation Services for care and treatment. Foster timely appealed.

The majority of the Court of Appeals panel affirmed; Judge Greene dissented. 33 Kan. App. 2d 717.

## ANALYSIS

Issue 1: *Did the assistant attorney general commit reversible misconduct in her opening statement?*

Foster argues that the assistant attorney general committed reversible misconduct during her opening statement by improperly commenting on the procedure leading up to the jury trial.

The assistant attorney general began by stating:

"There [are] going to be four things that I need to prove to you and I am going to go through each one of these things briefly and let you know what I anticipate the evidence is going to be in this case. Whether or not Mr. Foster is a sexually violent predator is the only determination that you need to make.

"The first thing is that he has been convicted of a sexually violent offense. That is the first element that I have to prove to you and there is not going to be any issue on that. Mr. Foster is — has stipulated to the fact that he has been convicted of aggravated sexual assault. He also was convicted of aggravated sexual assault. He also was convicted of aggravated incest here in Douglas County. That is why this matter . . . has been filed here because both of these convictions occurred here in Douglas County."

The assistant attorney general then began a recitation of the procedural history of the case:

"By the time we get to this point where we are in front of twelve jurors and are asking you to make this determination [that Foster is a sexually violent predator], a lot has happened. Not only has the Respondent been convicted of sexually violent offenses, but he has been incarcerated and has gone through a treatment program in prison and he has been evaluated by psychologists in prison and he was released on parole with the stipulation that he participate in outpatient treatment care. His parole was violated when it was determined that he was not progressing or doing well in the after-care treatment program, and also, there was indications through the parole office that he had had unsupervised contact and perhaps sexual contact with minors while on parole."

She then continued with what Foster primarily complains about on appeal:

*"After the parole is violated and he was back in prison again, then the case — [1] his case is reviewed by a committee called a multidisciplinary team which looks at all of his records, his charges, accusations, past sexual behavior, and that committee makes a determination as to whether or not he is a risk to reoffend. [2] Then it's passed on to another committee which, which is called the prosecutors' committee. That is where I come in and several other attorneys and we make a determination again based on the records, psychologists reviewed opinions in whether or not this man is at risk to reoffend, and [3] then there is a hearing, a probable cause hearing where a Judge determines whether or not the State has enough evidence to go forward under the Sexually Violent Predator Act. In this case, the Judge determined that there was."*

After noting Foster's resultant trip to the Hospital and his later evaluation by Rosenberg and Fernando, the assistant attorney gen-

eral concluded her recitation of the procedural history: *"So this respondent, Mr. Foster, has been through many layers of review and analysis until we finally get here, and that's the ultimate determination for you to make."* (Emphasis added.)

Foster argues that the italicized statements were improper because before the jury ever heard any evidence, it was told that a judge, a team of prosecutors, and a committee of professionals decided that Foster should be prosecuted as a sexually violent predator. He asserts that the statements predisposed the jury to find Foster is a sexually violent predator, an invasion of its province which requires reversal.

The State responds that because the proceeding is civil in nature, a claim of prosecutorial misconduct is inappropriate, citing *In re Care & Treatment of Rodriguez*, No. 91,467, unpublished opinion filed December 30, 2004 ("Proceedings held under the Act are civil in nature; a claim of prosecutorial misconduct is inappropriate in a civil proceeding."), Slip op. at 12. See also *Wallenta v. Moscowitz*, 81 Conn. App. 213, 233, 839 A.2d 641 (2004) (the law of prosecutorial misconduct does not apply in civil actions). According to the State, our stair-step analysis articulated in *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), therefore does not apply.

We begin our analysis of misconduct by acknowledging that the KSVPA is considered a civil proceeding, not a criminal one. *Kansas v. Hendricks*, 521 U.S. 346, 361, 365, 138 L. Ed. 2d 501, 117 S. Ct. 2072 (1997); *In re Care & Treatment of Hay*, 263 Kan. 822, 830, 953 P.2d 666 (1998). However, it possesses many criminal characteristics. As Judge Greene points out in his dissent, 33 Kan. App. 2d at 727, the statutory commitment scheme involves the attorney general as the "prosecuting attorney," K.S.A. 2004 Supp. 59-29a03(a); entitles the respondent to assistance of counsel if indigent, K.S.A. 2004 Supp. 59-29a06; requires a unanimous verdict of a jury, K.S.A. 2004 Supp. 59-29a07; carries the peril of indefinite commitment to the custody of the Secretary of Social and Rehabilitation Services, K.S.A. 2004 Supp. 59-29a07 and 29a-09; and requires a probable cause hearing, K.S.A. 2004 Supp. 59-29a05, which is akin to a criminal preliminary hearing. See *Hay*, 263 Kan. at 834. We also acknowledge Judge Greene's correct observation

that this court has applied a criminal rule to such cases. *Hay,* 263 Kan. at 835 ("'[A] rule applicable in criminal proceedings is relevant here: '[W]here an accused has gone to trial and been found guilty beyond a reasonable doubt, any error at the preliminary hearing stage is harmless unless it appears that the error caused prejudice at trial.' ").

We independently observe that, as in a criminal proceeding, the jury must make the sexually violent predator determination beyond a reasonable doubt. K.S.A. 2004 Supp. 59-29a07(a) and (e); *Hay,* 263 Kan. at 835. Finally, we acknowledge that "[p]roceedings for involuntary commitment, whether denominated civil or criminal, are subject to the due process clause of the Fourteenth Amendment, because such commitment imposes a massive or significant curtailment of liberty that requires due process protection." 53 Am. Jur. 2d, Mentally Impaired Persons § 5.

Most important, however, we observe that this court has held that attorney misconduct can require reversal in purely civil cases. *Smith v. Blakey, Administrator,* 213 Kan. 91, 515 P.2d 1062 (1973), contains some parallels. There, even though defense counsel had not objected, this court reversed and remanded for a new jury trial in a personal injury case because of the opposing counsel's conduct, including improper statements in closing argument. As this court stated:

"Under what circumstances do remarks of counsel result in reversible error? An uncontradictable answer must be: they are reversible error when, because of them, the parties have not had a fair trial. Factors necessary to a fair trial are an adequate hearing before an impartial tribunal based on legally admissible evidence relevant to the issues involved, free from bias or prejudice. We are not concerned in this proceeding with discipline for violations of our Code of Professional Responsibility . . . except as the actions which may constitute violations relate to the issue of a fair trial. After carefully reviewing this record, we have no hesitancy in finding *the remarks and conduct of counsel materially distracted and hindered the jury from returning an impartial verdict based upon the issues between the parties* and the evidence presented relevant to those issues." (Emphasis added.) 213 Kan. at 96.

See, *e.g., McKissick v. Frye,* 255 Kan. 566, 876 P.2d 1371 (1994); *Henderson v. Hassur,* 225 Kan. 678, 693, 594 P.2d 650 (1979) (Remarks of counsel result in reversible error when, because of

them, the parties have not had a fair trial.); K.S.A. 60-261 (new trial may be ordered if substantial rights of a party affected).

The Court of Appeals held that the assistant attorney general was merely outlining the case's history:

"Here, it appears that the State's opening statement outlined the history of the case so that the jury would understand how Foster's case reached the court. During the presentation of evidence, Rosenberg testified regarding the procedural background of the proceedings [the multidisciplinary team, the prosecutor's review committee, and the court's determination of probable cause.]. The Larned report admitted into evidence also contained a reference to the probable cause hearing which resulted in Foster's evaluation. ["A probable cause hearing in Douglas County Case #03-CT-5 resulted in an order that Mr. Foster be transported to SSH for an evaluation under the Sexual Predator Act."] The opening statement merely outlined the evidence which the State ultimately presented to the jury without objection. We conclude that the comments were within the wide latitude allowed in discussing the evidence." 33 Kan. App. 2d at 725.

The court held that even if the comments crossed the line by bolstering the credibility of the State's case, they were not so gross and flagrant as to have unduly prejudiced the jury against Foster nor were they made with ill will. 33 Kan. App. 2d at 725.

Judge Greene dissented, stating that the comments violated Foster's fundamental right to a fair trial by emphasizing that the sexually violent predator determination had already been made in the past. He criticized not only the references in the opening statement, but also the testimony from Rosenberg, the reference in the Hospital report, and the State's reference in its closing argument: "As I told you in my opening statement and as I think the evidence has shown to you, this man has gone through many levels of reviews." He wrote:

"Although my brethren find no plain error in the numerous references to the prior review determinations, I am offended by the extent to which this conduct invaded the province of the factfinder. What jury would have the nerve to return anything but an affirmative verdict for the State when it was made to appear that so many professionals who were presumably more expert than the jury — including a 'multidisciplinary team,' a 'prosecutor's review committee' and the court itself — had already indicated that Foster should be committed? I simply do not find any manifestation of legislative intent in the statutory scheme for this approach to these commitment proceedings. Whether it is called prosecutorial misconduct or something else, it offends my sense of justice for the respondent in

such proceedings to face such a 'stacked deck,' and I would reverse on this ground alone." 33 Kan. App. 2d at 730 (Greene, J., dissenting).

In support, Judge Greene cited the criminal case of *State v. Green*, 313 N.J. Super. 385, 712 A.2d 1245 (1998). There, the prosecutor commented on the defendant's grand jury indictment during her opening statement:

"I would also like to inform you the reason we are here is because of this indictment. This indictment is brought to this courtroom today because a few months ago a Grand Jury sat—which had consisted of 23 members. Their job was to listen to the case which the Prosecutor's Office presented to them, and by a majority of votes of the 23 members, *to determine whether or not there was enough probable cause to place an indictment against the defendant, and they did that, and that's why we are here today.*" (Emphasis added.) 313 N.J. Super. at 390.

The prosecutor reiterated during her summation, describing the 23-member grand jury's indictment as "our admitting ticket in this courtroom." 313 N.J. Super. at 390.

The *Green* court held:

"[W]hatever the prosecutor's intention may have been, arguing that the grand jury had found 'enough probable cause to have a true bill against the defendant regarding these charges' implied that the grand jury's indictment was a consideration which should influence them to convict. That implication is wrong and potentially prejudicial to the rights of the defendant . . . ." 313 N.J. Super. at 391.

Although the trial court had later instructed the jury that the indictment was not evidence of guilt, the Superior Court found that the instruction "did not adequately counter the suggestion implicit in the prosecutor's argument that the considered opinion of the grand jury was entitled to the trial jurors' deference." It concluded: "This misleading suggestion requires us to order a new trial." 313 N.J. Super. at 392.

In response to the contention of the majority of the Court of Appeals panel that the dissent was addressing arguments not objected to at trial and not asserted by Foster on appeal, *e.g.*, the admission of the evidence and the State's closing argument, Judge Greene replied that the majority was allowing the State's misconduct (the objectionable, but unobjected to, evidence and closing argument) to justify other State misconduct (opening statement).

While he disputed he was going beyond the appellate issues raised by Foster, he believed the case's exceptional circumstances nevertheless allowed the court to take appropriate action as justice required, citing *State v. Puckett,* 230 Kan. 596, 600-01, 640 P.2d 1198 (1982) (although ordinarily an appellate court will not consider an issue which has not been raised in the trial court, or which has not been raised by the parties on appeal, the court has the power to do so in exceptional circumstances, where consideration of the new issue is necessary to serve the ends of justice or to prevent a denial of fundamental rights).

We agree that the case must be reversed and remanded for a new trial. We conclude the opening statement itself is sufficient to require reversal. Accordingly, we need not determine whether to invoke the *Puckett* doctrine and decide whether the unobjected-to evidence and closing argument resulted in a denial of fundamental rights. Rather, we will address the issues of the evidence and closing argument because they may arise during the retrial. See *State v. Kunellis,* 276 Kan. 461, 78 P.3d 776 (2003). Stated simply, we see no reason whatsoever, even in a noncriminal proceeding, why the State's attorney — or the State's evidence — need mention the levels of review of the case that occurred before it was brought to this jury. More important, we conclude that these statements by the State, and this type of State evidence, "stack the deck" against Foster.

We first note that a jury has a natural tendency to look for guidance from those clothed in authority, *i.e.,* a multidisciplinary team of professionals, a team of prosecutors, and a district court judge, even when the guidance is not intended. See *State v. Pabst,* 268 Kan. 501, 506, 996 P.2d 321 (2000) (discussing the influence of the prosecutor: because he is a servant of the law and a representative of the people of Kansas, jury may be misled into thinking his personal opinions were validated by the weight of the State of Kansas); *Lollis v. Superior Sales Co.,* 224 Kan. 251, 264, 580 P.2d 423 (1978) (discussing the influence of police officer testimony); *State v. Boyd,* 222 Kan. 155, 159, 563 P.2d 446 (1977) (discussing the influence of the trial judge).

We acknowledge that juries may assume that anytime a criminal case is brought before them, some prosecutor has made a prior decision that the case is prosecution-worthy. However, prosecutors do not openly inform the jury of their personal presuit involvement as was done here: "That is where I come in and several other attorneys and we make a determination again based on the records, [and on] psychologists' reviewed opinions in whether or not this man is at risk to reoffend." Such comments can have the effect of a prosecutor commenting on the credibility of her own witnesses, *i.e.,* "[b]ecause Dr. Fernando and Rosenberg agree with me and my team of attorneys that Foster is at risk to offend, they are worthy of belief." Or, they can constitute an improper interjection of the prosecutor's personal opinion into the trial: "In my opinion, Foster is a sexually violent predator." We have prohibited both practices. *State v. Pabst,* 268 Kan. at 506; *State v. Abu-Isba,* 235 Kan. 851, 859, 685 P.2d 856 (1984).

Ultimately, however, the most troubling aspect of the opening statement is the State's reference to the judge's prior determination of probable cause: "[T]hen there is a hearing, a probable cause hearing where a Judge determines whether or not the State has enough evidence to go forward under the Sexually Violent Predator Act. In this case, the Judge determined that there was." While it is prejudicial for a prosecutor to refer to a grand jury's prior determination of probable cause to believe the defendant has committed a crime, see *State v. Green,* 313 N.J. Super 385, invoking the *judge's* prior determination of probable cause to believe that the defendant is a sexually violent predator is even more damaging because it expresses judicial approval of the State's case.

Kansas case law is replete with references to the position of trust occupied by a judge in a jury trial. Because juries have a natural tendency to look to a trial judge for guidance, " 'The trial judge should be the exemplar of dignity and impartiality.' " *State v. Plunkett,* 257 Kan. 135, 137, 891 P.2d 370 (1995). We have noted that the jury " 'can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word.' " *State v. Hamilton,* 240 Kan. 539, 545, 731 P.2d 863 (1987). Moreover, " 'The judge's attitude and the

result he [or she] supposedly desires may be inferred by the jury from a look, a lifted eyebrow, in inflection of the voice — in many cases without warrant in fact.' " *State v. Hamilton*, 240 Kan. at 547 (quoting *State v. Boyd*, 222 Kan. 155, 158-59, 563 P.2d 466 [1977]).

Because of the need for judges to remain impartial, Kansas appellate courts have granted new trials when the judge has involved himself or herself too much in the jury's function, *i.e.*, influencing the jury on how to vote. *State v. Plunkett*, 257 Kan. 135 (judge interjected belief regarding testimony); *State v. Hamilton*, 240 Kan. at 544 (Judge volunteered during a cross-examination that the lack of fingerprints is "not going to prove anything. Probably prove that they did a good job of wiping off fingerprints."); *State v. Chappell*, 26 Kan. App. 2d 275, 279, 987 P.2d 1114 (1999) (trial court improperly lent its exalted weight to the testimony of the prosecution's primary witness in a closely balanced case by stating, in jury's presence that she has answered all the questions truthfully). Kansas appellate courts have considered the effect of inappropriate judicial conduct in not only criminal cases, but also civil. *White v. New Hampshire Ins. Co.*, 227 Kan. 293, 298, 607 P.2d 43 (1980); *Plains Transport of Kansas, Inc., v. Baldwin*, 217 Kan. 2, 10, 535 P.2d 865 (1975).

Because the result a judge supposedly desires may be inferred by the jury from a look, a lifted eyebrow, or an inflection of the voice to the extent a new trial is warranted, *a fortiori* an attorney's reference to a judge's *prior decision* supporting the attorney's case can certainly influence a jury to the extent that reversal is required.

For example, in *Sanguinetti v. Moore Dry Dock Co.*, 36 Cal. 2d 812, 228 P.2d 557 (1951), the California Supreme Court specifically addressed the problem of an attorney suggesting judicial approval of his action in a civil case. There, plaintiff's counsel made a motion to increase his prayer for $50,000 in damages in the presence of the jury at the close of his evidence. The motion was granted in the jury's absence, but the court informed the jury at the close of all the evidence that the damages could not be greater than $75,000, the new amount. The jury returned a verdict for $75,000. The supreme court held that the trial court's action sent the implied message to the jury that it believed the increased dam-

ages were warranted by the evidence. As the *Sanguietti* holding was later explained by the supreme court in *Cassim v. Allstate Ins. Co.*, 33 Cal. 4th 780, 802, 16 Cal. Rptr. 3d 374, 94 P.3d 513 (2004), "Because the trial court's views would necessarily have undue weight with the jury, implying the trial court approves of some portion of a litigant's case is improper." 33 Cal. 4th at 799. The *Sanguietti* court reversed and remanded for a new trial.

For similar facts and holdings, see *Pfeil v. Klein*, 247 App. Div. 510, 511, 286 N.Y.S. 721 (1936) ("The effect of the granting of the motion to conform the pleadings to the proof was to conform the pleading to whatever verdict the jury might find, and this occurring, as it did, in the presence of the jury, carried the implication that the court thought that the proof warranted a verdict larger than [the original prayer]." Because the verdict was greater than the original amount prayed for, "[t]his caused prejudice to defendants which requires a reversal."); *Kenney v. South Shore Natural Gas & Fuel Co.*, 126 App. Div. 236, 237-38, 110 N.Y.S. 503 (1908).

Correspondingly, in *Neumann v. Bishop*, 59 Cal. App. 3d 451, 485, 130 Cal. Rptr. 786 (1976), plaintiff's counsel's closing argument suggested the trial court would not have accepted his lawsuit for filing unless the amount of damages prayed for had qualified for the court's monetary jurisdiction. Counsel also implied that the trial court had approved or endorsed the testimony of his expert witnesses, when the court had simply approved his right to present such experts. Although the California Court of Appeals did not reverse, it found counsel had committed misconduct because "it is improper and misconduct for counsel to argue that his case or some aspect thereof has judicial approval." 59 Cal. App. 3d at 485. Compare *In re M.S.*, 115 S.W.3d 534, 538 (Tex. 2003) ("Here, the jury was permitted to see findings of fact made by the very judge presiding over the trial, and those facts were the very ones that the jury itself was being asked to find. The fact-finding present in the orders admitted as evidence comes far too close to 'indicating the opinion of the trial judge as to the verity or accuracy of the facts in inquiry.' " Nevertheless, the court ultimately found the error was harmless.).

In short, allowing the State in this KSVPA commitment proceeding to tell the jurors — before it even hears any evidence — that a multidisciplinary team of professionals, a team of prosecutors (including the attorney prosecuting the case), and the judge have all previously determined that sexually violent predator commitment proceedings should proceed against Foster is extremely prejudicial. At a minimum, it is inconsistent with substantial justice and affects his substantial rights, see K.S.A. 60-261, and denies him his right to a fair trial. We reach these conclusions after considering the admittedly strong evidence against Foster. On retrial, such statements by counsel and associated evidence are prohibited.

Foster claims the district court committed further error. These claims could now be disregarded because of our reversal and remand on attorney misconduct grounds. We address them below, however, to supply guidance because they could arise in a retrial. See *State v. Kunellis*, 276 Kan. 461. For this reason, any argument by the State that the claims were not preserved for appeal, or that Foster's rights, if violated, do not warrant reversal, are now moot.

Issue 2: *Did the district court err in admitting the entire Hospital report as an exhibit?*

Next, Foster argues the district court erred in admitting the 25-page Hospital report because it contained inadmissible statements regarding polygraph test results. Specifically, Page 2 of the report states:

"[P]olygraph examinations showed 'deception on having sexual contact with minors while on parole,' according to a report dated May 19, 1999, and another polygraph 'came up deception indicated for contact with minors.'. . .
. . . .
"Mr. Foster did not mention, nor was he asked about, polygraph results suggesting he had unauthorized contact with children, in addition to unauthorized sexual contact with children, while on parole."

The report also referred to the polygraph results in assessing Foster's future dangerousness or the likelihood of reoffending: "An *additional concern* is the fact polygraph examinations suggested he was deceptive with regard to having unauthorized contact with, including sexual contact with, minors while on parole." (Emphasis added.)

In Kansas, absent stipulation by the parties, the results of a polygraph test are inadmissible in criminal proceedings. *State v. Shively*, 268 Kan. 573, 579, 999 P.2d 952 (2000). We have additionally held inadmissible the fact that an examination was taken, or, absent a stipulation, an offer was made or an offer was refused. *State v. Webber*, 260 Kan. 263, 276, 918 P.2d 609 (1996). However, "mere mention of the 'polygraph' is not grounds for mistrial." *State v. Green*, 245 Kan. 398, 406, 781 P.2d 678 (1989). Our rationale for inadmissibility has been two-fold: first, polygraph examinations are not generally accepted as reliable in the relevant scientific community; second, juries may place undue weight on it because it stands as a kind of witness in absentia on the question of whether a witness is telling the truth, usurping the role of the jury. 268 Kan. at 586.

The State points out that polygraph results are allowed, however, in probation revocation hearings. *State v. Lumley*, 267 Kan. 4, 14, 977 P.2d 914 (1999). As the *Lumley* court noted: "Probation revocation hearings are not criminal trials, and there are significant differences as to a defendant's rights and the admission of evidence in a criminal trial and a revocation hearing." 267 Kan. at 13. For example, there we observed that proof beyond a reasonable doubt is not required to establish a violation of a condition of probation; rather, a preponderance of evidence is sufficient. 267 Kan. at 14 (citing *State v. Rasler*, 216 Kan. 292, 295, 532 P.2d 1077 [1975]).

As a result, we concluded in *Lumley*:

"The relaxed standard of proof and the fact that a probation revocation decision is a judicial decision rather than a jury decision are additional factors that strongly support a determination that polygraph test results are sufficiently reliable to be considered evidence in probation revocation proceedings." 267 Kan. at 14.

By contrast, proceedings under the KSVPA require proof beyond a reasonable doubt and the respondent is entitled to a unanimous jury verdict that he or she is a sexually violent predator. See K.S.A. 2004 Supp. 59-29a06(c); K.S.A. 2004 Supp. 59-29a07(a) and (e). We also observe that unlike probation revocation proceedings, where criminal confinement to a definite term is at stake, the KSVPA carries the peril of indefinite commitment. Consequently,

we conclude that references to the polygraph examination, polygraph results, and any opinions based upon those results must be excised from the Hospital report if it is admitted into evidence on remand.

Also to be excluded from evidence are counsel statements and witness testimony, e.g., opinions, which are based upon the polygraph examination and results, either directly or indirectly. *Cf. Estate of Neumann v. Neumann*, 242 Wis. 2d 205, 238, 626 N.W.2d 821 (Wis. App. 2001) (Allowing defense experts to testify that they relied in part on the results of defendant's polygraph examination in forming their opinions would inform the jury that a polygraph had been taken and allow the jury to infer that those results were favorable to defendant. The effect would be the admission of polygraph results, which are inadmissible.).

This evidence includes, among other things:

The assistant attorney general's opening statement when, after stating that Foster's parole was violated when it was determined that he was not progressing or doing well in the after-care treatment, she added: "and also, *there was [sic] indications through the parole office that he had had unsupervised contact and perhaps sexual contact with minors while on parole.*"

The assistant attorney general's closing statement in which she said, "*The parole officer also had some evidence that he was in fact in contact with minors again,* and that is why we are here." (Emphasis added.)

And her rebuttal: "The people who monitored him on parole knew what his conditions were and they could see he was not participating in treatment, *and they could tell from the evidence that they had that he was having unsupervised contact with minors* and they pulled him back him." (Emphasis added.)

The part of Rosenberg's testimony which was based upon polygraph results, though direct mention of the examination or results was not made:

"Q: Was there any indication to you in the records that you reviewed that while he was on parole that he did come in contact with minors?

"A: In the documents provided to me in connection with his treatment in that program, *they had some reason to suspect and to believe that he had not only*

*come into contact with minors, but also there was some references to the possibility he had sexual contact with minors."* (Emphasis added.)

Similarly, to the extent any opinions or determinations rely upon the inadmissible polygraph examination or results, those portions must be excluded from evidence. *Cf. Mesecher v. Cropp,* 213 Kan. 695, 702, 518 P.2d 504 (1974) (expert opinions based upon inadmissible evidence are inadmissible); *West v. Martin,* 11 Kan. App. 2d 55, 713 P.2d 957, *rev. denied* 239 Kan. 695 (1986); *In re Watson,* 5 Kan. App. 2d 277, 615 P.2d 801 (1980).

We do not address whether the polygraph is an effective tool for evaluative purposes under the KSVPA. We merely prohibit reference to it and its admission into evidence, directly and indirectly, at the KSVPA trial.

Issue 3: *Did the district court err in instructing the jury on issues relating to the commitment, treatment, and possible release of Foster?*

Finally, Foster asserts the district court improperly instructed the jury concerning his commitment, treatment, and possible release. Because he objected, the following standard of review applies, as taken from the KSVPA case of *In re Care & Treatment of Hay,* 263 Kan. 822, 841-42, 953 P.2d 666 (1998).

" ' "It is the duty of the trial court to properly instruct the jury upon a party's theory of the case. Error regarding jury instructions will not demand reversal unless [it results] in prejudice to the appealing party. Instructions in any particular action are to be considered together and read as a whole, and where they fairly instruct the jury on the law governing the case, error in an isolated instruction may be disregarded as harmless. If the instructions are substantially correct, and the jury could not reasonably be misled by them, the instructions will be approved on appeal." ' "

The objected-to Instruction No. 2 states:

"This proceeding has been commenced by the filing of a petition by the petitioner, State of Kansas. This trial is to determine whether the respondent, Randy A. Foster is a sexually violent predator who should be civilly committed to the custody of the Secretary of Social and Rehabilitation Services for control, care and treatment until such time as his mental abnormality or personality disorder has so changed that he is safe to be at large. It is the duty of the jury to determine whether Randy A. Foster is a sexually violent predator.

"You have nothing whatever to do with the nature of any civil commitment or the length of any commitment which may follow in the event you find that the respondent is a sexually violent predator."

The jury was also given Instruction No. 10, which states: "You must weigh and consider this case without favoritism for or prejudice against either party. You must not be influenced by anything not within the issues of the case. Sympathy should not enter into your deliberations."

Foster asserts that the jury instructions direct the jury to determine whether Foster should be committed for care and treatment until he is safe to be at large. He argues that the "safe to be at large" language suggested to the jury that Foster would have been "unleashed on society" if the jury failed to find him a sexually violent predator. The State replies that the instruction's language was contained in the applicable statute, K.S.A. 2004 Supp. 59-29a07(a), and that the language was necessary to clarify the nature of the proceedings due to defense counsel's assertion during trial that the State wished to keep Foster "incarcerated."

K.S.A. 2004 Supp. 59-29a07(a) provides:

"The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator. If such determination that the person is a sexually violent predator is made by a jury, such determination shall be by unanimous verdict of such jury. Such determination may be appealed. If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the secretary of social and rehabilitation services for control, care and treatment until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large. Such control, care and treatment shall be provided at a facility operated by the department of social and rehabilitation services."

Based on the plain language of the statute, a jury shall only determine whether the individual is a sexually violent predator; the jury shall not determine control, care, or treatment. See also *In re Care & Treatment of Lair*, 28 Kan. App. 2d 51, 53-54, 11 P.3d 517, *rev. denied* 270 Kan. 898 (2000) (upholding exclusion of evidence pertaining only to control, care and treatment).

In support of his argument of reversible error, Foster cites *People v. Collins*, 10 Cal. App. 4th 690, 12 Cal. Rptr. 2d 768 (1992).

In *Collins*, when defendant became eligible for parole following his conviction for grand theft, the Board of Prison Terms ordered him committed to a state mental hospital. Thereafter, a jury trial took place to determine whether he satisfied the criteria of a mentally disordered offender. The jury was instructed that Collins would be released on parole unless the contrary was proven beyond a reasonable doubt. 10 Cal. App. 4th at 694.

The jury received two verdict forms. The first stated that Collins met the criteria and should be treated as an inpatient; the second stated that he did not meet the criteria and should be released on parole. The California Court of Appeal held that it was error to instruct the jury on the consequences of the mental illness conclusion because the instruction encouraged the jury to ignore evidence and decide the case based on fear of the offender's release. 10 Cal. App. 4th at 695-96. The court noted that the error was exacerbated by the directory language of the verdict forms, as well as the prosecutor's statements that Collins would go back to the streets if the jury did not find him to be a mentally disordered person. 10 Cal. App. 4th at 696.

As our Court of Appeals noted in rejecting Foster's argument, *Collins* is distinguishable. In the present case, the language at issue was not included on the verdict form; rather, it was included in a jury instruction. In addition, the State did not emphasize to the jury that Foster would be released into society pending the decision. Further, the jury was specifically instructed that it had "nothing whatever to do with the nature of any civil commitment or the length of any commitment which may follow *in the event* you find that the respondent is a sexually violent predator." (Emphasis added.) Nevertheless, in his dissent, Judge Greene found that Instruction No. 2 was "even more harmful than its parallel in *Collins* because it clearly implied or presupposed that Foster suffered from a 'mental abnormality or personality disorder' and was subject to commitment until 'he is safe to be at large.' " 33 Kan. App. 2d at 733 (Greene, J., dissenting).

In finding that the instruction did not improperly emphasize the issue of treatment, the majority cited *Boone v. State*, 147 S.W.3d 801 (Mo. App. 2004). There, the Missouri Court of Appeals dealt

with a similar instruction issue in a sexually violent predator case. Unlike in Kansas, the applicable Missouri statute provides in pertinent part: "If the trial is held before a jury, the judge shall instruct the jury that if it finds that the person is a sexually violent predator, the person shall be committed to the custody of the director of the department of mental health for control, care and treatment." Mo. Rev. Stat. § 632.492 (2005).

The *Boone* court instructed the jury based on the statute: "If you find [Boone] to be a sexually violent predator, [Boone] shall be committed to the custody of the director of the department of mental health for control, care and treatment." 147 S.W.3d at 808. The Missouri Court of Appeals held that the trial court did not err in submitting the instruction to the jury because it "did not have a substantial potential for prejudicial effect. An average jury would understand that a finding that Boone was [a sexually violent predator] would subject him to the 'control, care and treatment' of the department of mental health." 147 S.W.3d at 808. See also *Lewis v. State,* 152 S.W.3d 325, 329-30 (Mo. App. 2004); *Smith v. State,* 148 S.W.3d 330, 336 (Mo. App. 2004); *Care and Treatment of Scates v. State,* 134 S.W.3d 738, 742 (Mo. App. 2004) (discussing sexually violent predator jury instructions that follow substantive law).

We hold that our jury Instruction No. 2 accurately states the law as set forth in K.S.A. 2004 Supp. 59-29a07(a). We also observe that it provides conditional language three different times: "This trial is to determine *whether* the respondent, Randy A. Foster is a sexually violent predator," and "It is the duty of the jury to determine *whether* Randy A. Foster is a sexually violent predator." Finally, "You have nothing whatever to do with the nature of any civil commitment or the length of any commitment which may follow *in the event* you find that the respondent is a sexually violent predator." (Emphasis added.) Accordingly, it does not suggest to the jury that Foster's treatment is in the jury's hands, and it does not instill fear that Foster would be "unleashed on society." We conclude that the instructions, when read as a whole, fairly and accurately state the law of the case. *In re Care & Treatment of Hay,* 263 Kan. at 841-42.

Nevertheless, even the majority of the Court of Appeals panel acknowledged that "the second sentence of Instruction No. 2 was not artfully drafted and contained unnecessary language about Foster's potential care and treatment." 33 Kan. App. 2d 722. Accordingly, upon remand, the district court may consider modifying that sentence for clarity so it reads as follows: "This trial is to determine whether the Respondent, Randy A. Foster, is a sexually violent predator."

The Court of Appeals is reversed. The district court is reversed, and the case is remanded for a new trial in accordance with the directions provided by this opinion.

LOCKETT, J., Retired, assigned▮