

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00188-CV

**IN RE: COMMITMENT OF** Richard P. **BARNES**

From the 186th Judicial District Court, Bexar County, Texas
Trial Court No. 2016CI08424
Honorable Jefferson Moore, Judge Presiding

Opinion by:    Rebeca C. Martinez, Justice

Sitting:    Karen Angelini, Justice
Marialyn Barnard, Justice
Rebeca C. Martinez, Justice

Delivered and Filed:  August 15, 2018

AFFIRMED

Richard P. Barnes appeals the trial court's judgment and order of civil commitment following a jury's determination that he is a sexually violent predator as defined in the Texas Health and Safety Code.  In four issues, Barnes complains of evidentiary errors committed by the trial court.  We affirm the trial court's judgment and order of commitment.

### BACKGROUND

In enacting the Civil Commitment of Sexually Violent Predators Act, the Texas Legislature found that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence."  TEX. HEALTH & SAFETY CODE ANN. § 841.001 (West 2017).  It further found

that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state. *Id.* To warrant an individual's commitment as a sexually violent predator, the State is required to prove beyond a reasonable doubt that the person is (1) a "repeat sexually violent offender," and (2) suffers from "a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* §§ 841.003(a), 841.062(a) (West 2017). A person is a "repeat sexually violent offender" if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id.* § 841.003(b); *see also id.* § 841.002(8) (West 2017) (defining a "sexually violent offense"). A "behavioral abnormality" is "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2) (West 2017). A "predatory act" is one that is "directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5) (West 2017).

On May 17, 2016, the State of Texas filed a petition alleging that Barnes is a sexually violent predator as defined by section 841.003 of the Health and Safety Code and requesting that he be committed for treatment and supervision. At the commitment trial, a pen packet reflecting Barnes's two convictions for sexually violent offenses was admitted into evidence. In 1998, Barnes was charged with multiple counts of aggravated sexual assault of a child in two separate cases. In the first case, Barnes was charged with four counts of aggravated sexual assault against four-year-old V.H. In the second case, he was charged with five counts of aggravated sexual assault against six-year-old C.M. In the first case, Barnes pled guilty to Count I (digital penetration) and in the second case he pled guilty to Count IV (digital penetration). In both judgments, it is noted as a term of the plea agreement that "89CR3244 [was] taken into

consideration." In cause number 89CR3244, Barnes was charged with sexually assaulting his seven-year-old stepdaughter. In both cases, the trial court sentenced Barnes to twenty years in prison; the sentences were ordered to run concurrently.

At the commitment trial, the State called Barnes and Dr. Jason Dunham, a psychologist, as witnesses. Barnes called Dr. John Tennison. Dr. Dunham testified that, in his opinion, Barnes suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. As the basis for his opinion, Dunham interviewed Barnes for approximately two hours. In addition, he reviewed Barnes's pen packet, a referral report from Dr. Charles Woodrick, Barnes's criminal justice file, and prior law enforcement reports. Dunham explained that in reaching his opinion, he must consider the details of the underlying convictions. He stated that in relation to the second conviction, Barnes was accused of assaulting his wife's niece C.M. on numerous occasions when she was between six and eight years old. The child reported sexual intercourse on two or three different occasions. She also reported instances of Barnes kissing her on the mouth and breasts, fondling her vagina, and putting his finger inside her vagina, and stated that he told her not to tell anyone. At the time, Barnes was between 44 and 46 years of age. The abuse was discovered when Barnes's son alleged that Barnes had assaulted him for a period of years when he was between nine and thirteen years old; the allegations were never substantiated and Dunham could not ascertain whether Barnes actually assaulted his son. Dunham stated that Barnes denied assaulting C.M. and explained that he accidentally touched her while bathing her. The case records contain Barnes's confession made to police wherein he stated he put his finger in the girl's vagina on two or three occasions, both in the bathtub and on the couch. Barnes blamed the child for being the instigator, saying she would give him massages and grab his penis and he would have to tell her to stop. Dunham stated that several risk factors were associated with this

offense, including that intercourse with a young child occurred on multiple occasions and that he blamed the victim.

Barnes's first conviction stemmed from his assault of four-year-old V.H, who was the daughter of Barnes's co-worker. The child reported that Barnes walked into the living room naked while she was watching television and also that she woke up during the night a couple of times with his finger in her vagina. At the time, Barnes was 47 years old. In his interview with Dunham, Barnes denied the assaults and stated he accidentally touched the girl's vagina while bathing her. Dunham explained that this offense showed an increase in deviancy given the victim's young age and the fact that he had assaulted a second child. Dunham also considered the fact that the victim was unrelated to Barnes to be a risk factor for reoffending.

When Barnes was investigated for assaulting C.M. and V.H., he admitted putting his finger in his seven-year-old stepdaughter's vagina. The girl described Barnes putting his penis between her legs on multiple dates. Dunham was not certain that actual penetration occurred. Barnes offered her money so that she would not tell anyone what happened. Barnes was arrested but the charge was dismissed in exchange for Barnes's guilty plea in the other two cases. Dunham saw this charge as creating a pattern of behavior showing that Barnes has assaulted young girls over a long period of time. Dunham stated that because Barnes continued to commit assaults after the first arrest in 1989, he was classified as a recidivist.

As part of the 1998 guilty pleas, Barnes made certain stipulations to the court, including that he had assaulted several other females. Barnes's half-sister accused him of 1) attempting to rape her when she was seven years old and 2) raping her when she was seventeen years old. Barnes's sister reported that he exposed himself to her at a family gathering. Dunham stated that these accusations show a pattern of abuse dating back to when Barnes was 25 years old—almost all his adult life. Barnes was alleged to have exposed himself to another niece when she was 11

or 12 years old. A female friend of his son reported that Barnes asked her to go skinny dipping with him; she was 12 years old. Another woman reported that Barnes babysat her four-year-old daughter one night. When she returned at 1:30am to take the child home, the girl was sleeping in a bed with Barnes while his wife was in another room; the child was only wearing her underwear. Dunham considered this allegation significant because the child was effectively a stranger to Barnes.

Finally, Dunham testified about an uncharged and unadjudicated incident that Barnes did not stipulate to when he pleaded guilty to his two convictions. An eleven-year-old girl reported to police that she was selling jewelry door to door; she claimed that Barnes stood at the door behind his wife; he was wearing a robe and smiling and winking at her with his chest and stomach exposed. The girl and her friend came inside; Barnes sat on the couch and pulled the robe aside to show his full penis. The police were called and Barnes stated his penis might have accidentally been exposed while reaching for something. Dunham thought the victim "might have been a little exaggerating," but nevertheless considered the event significant because it showed that Barnes was not deterred by police intervention.

Dunham described Barnes as having a very, very strong pedophilia disorder and a long history of offending against children. Dunham stated that Barnes did not have an extensive disciplinary record in prison because he did not have access to his "target group," which was primarily female children. In Dunham's opinion, the likelihood of Barnes reoffending was high. He stated that Barnes was different from the typical sex offender because he has a pattern of reoffending. Dunham elaborated, stating that Barnes is in the small category of people who reoffend after the police get involved and after he is charged and taken to jail. In addition, Dunham stated that Barnes is different from the typical sex offender due to the high number of victims. He also stated that his sexual deviancy separates him from the typical offender, because Barnes's

victims were all different ages and relation and the acts he committed—from fondling to intercourse—varied as well.

Dunham testified that he also considered protective factors in gauging Barnes's risk of reoffending. He stated Barnes's biggest protective factor was his age of 66, because as a man ages, his risk level for child molesting decreases. Another protective factor is that Barnes is not antisocial, meaning he does not have any nonsexual criminal history. He did not abuse drugs or alcohol, maintained stable employment, and did not have disciplinary problems in prison. Nevertheless, Dunham did not believe these protective factors minimized Barnes's behavioral abnormality. Dunham explained that Barnes still has sexual drive, and that he admitted he can still get an erection and has nocturnal emissions. In fact, Dunham believed Barnes's age might operate as a risk factor because it makes him more approachable to children because he has a "grandfatherly look" and may be able to use his age as a grooming tactic.

Dunham diagnosed Barnes with pedophilic disorder and explained that he has a sexual deviancy and arousal toward prepubescent children. Dunham described pedophilia as a paraphilic, or lifelong disorder. Dunham testified that although Barnes scored "low" on the Static-99R test which measures future risk of sexual re-offense, he did not believe it was an accurate reflection of his true risk because the test was not applicable to this type of case. He believed that Barnes's true risk category was high.

Barnes was called as the next witness. He denied ever assaulting a child. He testified that he accidentally touched C.M. and V.H. on their vaginas while giving them a bath. He denied knowing any of the other alleged victims and stated he had no memory of any other alleged assaults. He stated that he could not have assaulted his half-sister in 1975 because he was deployed and not in the United States.

Dr. Tennison was the final witness. Tennison interviewed Barnes and reviewed his records and opined that he does not have a behavioral abnormality. Tennison testified that Barnes's score on the Static-99R test reflects a low chance of recidivism. Tennison further testified that the recidivism rate for people who have offended against children is at six percent at age 60 and drops to zero by age 70. Tennison described Barnes as fitting the typical profile of someone with pedophilic disorder, and thus, as a typical sex offender, he would have the normal rates of recidivism. He explained that it is typical for pedophiles to have numerous victims of varying relation. Tennison did not believe Barnes was currently likely to engage in predatory acts of sexual violence.

The jury found that Barnes is a sexually violent predator with a behavioral abnormality that makes him more likely to engage in a predatory act of sexual violence. The trial court signed a final judgment and a commitment order civilly committing Barnes in accordance with section 841.081 of the Texas Health and Safety Code. TEX. HEALTH & SAFETY CODE ANN. § 841.081 (West 2017). This appeal followed.

## DISCUSSION

In his first issue, Barnes challenges the admission of evidence regarding the administrative screening process used to detect civil commitment candidates. During his testimony, Dr. Dunham explained that in making his assessment, he relied on a report by Dr. Charles Woodrick in which Woodrick concluded that Barnes suffered from a behavioral abnormality. Barnes did not object to Dunham's testimony below, but now contends that admission of Dunham's testimony regarding the screening process constitutes fundamental error that may be raised for the first time on appeal.

The Beaumont Court of Appeals[1] has held that this type of alleged error "does not fall within the narrow scope of the 'fundamental error' doctrine recognized by the Texas Supreme Court" in civil cases. *In re Commitment of King*, No. 09–13–00255–CV, 2014 WL 346109, at *5-6 (Tex. App.—Beaumont Jan. 23, 2014, no pet.) (mem. op.). Barnes urges us to depart from the conclusion reached by our sister court and to instead follow the Supreme Court of Kansas. In *In re Foster*, 127 P.3d 277 (Kan. 2006), the prosecutor was accused of misconduct when she described the screening process in opening statements. The Kansas high court held that the prosecutor telling the jury—before it even heard any evidence—that a multidisciplinary team of professionals, a team of prosecutors (including the attorney prosecuting the case), and the judge have all previously determined that sexually violent predator commitment proceedings should proceed against the defendant was extremely prejudicial and denied the defendant his right to a fair trial. *Id*. at 288.

Here, there has not been an allegation of prosecutorial misconduct, and we thus decline to follow the Kansas court. Because Barnes's complaint was not preserved for review, we overrule his first issue. *See In re Commitment of King*, 2014 WL 346109, at *5-6; *see also* TEX. R. APP. P. 33.1.

In his second issue, Barnes contends the trial court erred by overruling his hearsay and Rule of Evidence 705(d) objections to the State's expert revealing that an expert before him also believes Barnes suffers from a behavioral abnormality. As previously discussed, Dunham testified that he relied on the report prepared by Dr. Woodrick in which Woodrick determined that Barnes suffers from a behavioral abnormality. Dunham was asked whether it was usual in commitment

---

[1] Until the Sexually Violent Predator Act was amended in 2015, the district court in Montgomery County, Texas had exclusive jurisdiction over all petitions filed under the Act, with appeals heard by the Beaumont Court of Appeals and the Texas Supreme Court. *In re Commitment of Mares*, 521 S.W.3d at 66.

proceedings for there to be another evaluation done by a psychologist and he answered, "yes." Barnes objected on hearsay grounds and on the ground that the testimony was more prejudicial than probative. *See* TEX. R. EVID. 705(d). The trial court overruled the objections, stating that it would permit Dunham to discuss his review of Barnes's psychological records.

We review a trial court's decision to admit evidence in a commitment proceeding for an abuse of discretion. *In re Commitment of Mares*, 521 S.W.3d 64, 69 (Tex. App.—San Antonio 2017, pet. denied). The Beaumont Court of Appeals has determined that the Rules of Evidence permit hearsay evidence similar to that at issue in this case. *See In re Commitment of Carr*, No. 09-14-00156-CV, 2015 WL 1611949, at *2 (Tex. App.—Beaumont Apr. 9, 2015, no pet.) (mem. op.) (trial court did not err by permitting testifying expert to testify about nontestifying expert's report that concluded appellant suffers from behavioral abnormality); *In re Commitment of Winkle*, 434 S.W.3d 300, 315 (Tex. App.—Beaumont 2014, pet. denied) (trial court did not abuse its discretion in admitting, over hearsay objection, expert's testimony that two nontestifying experts found appellant has behavioral abnormality); *In re Commitment of Garcia*, 09-12-00194-CV, 2013 WL 6558623, at *6 (Tex. App.—Beaumont Dec. 12, 2013, pet. denied) (mem. op.) (same); *see also* TEX. HEALTH & SAFETY CODE ANN. §§ 841.023, 841.041(a) (West 2017). An expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed. TEX. R. EVID. 703. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. *Id.* Rule of evidence 705(a) permits a trial court to admit the underlying facts or data on which an expert has based an opinion. TEX. R. EVID. 705(a); *In re Commitment of Ochoa*, No. 09-15-00486-CV, 2016 WL 5417441, at *4 (Tex. App.—Beaumont Sept. 29, 2016, pet. denied) (mem. op.); *In re Commitment of Carr*, 2015 WL 1611949, at *2. Thus, when an expert relies upon hearsay in forming his opinion, and that hearsay evidence is of

a type reasonably relied upon by such experts, the jury is generally permitted to hear it. *See In re Commitment of Sawyer*, 05-17-00516-CV, 2018 WL 3372924, at *5 (Tex. App.—Dallas July 11, 2018, no pet. h.) (mem. op.); *In re Commitment of Carr*, 2015 WL 1611949, at *2; *In re Commitment of Salazar*, No. 09-07-345-CV, 2008 WL 4998273, at *4 (Tex. App.—Beaumont Nov. 26, 2008, pet. denied) (mem. op.). If the underlying facts or data would otherwise be inadmissible, those facts or data should be excluded only if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect. TEX. R. EVID. 705(d). Rule 705(d) provides for the use of a limiting instruction by the court to ensure that otherwise inadmissible evidence is not improperly used by the jury. TEX. R. EVID. 705(d); *In re Commitment of Sawyer*, 2018 WL 3372924, at *5.

We cannot conclude the trial court abused its discretion in admitting the evidence under Rule 705(d). We agree with the Beaumont Court of Appeals that Rule 705 permits a trial court to allow a testifying expert to give a nontestifying expert's opinion that an individual suffers from a behavioral abnormality. Here, Dr. Dunham testified that his evaluation of Barnes included a review of various records, including Dr. Woodrick's prior evaluation of Barnes. Dunham testified that he relied upon the information and data contained in Dr. Woodrick's report. Further, the trial court properly applied Rule 705(d) by giving the jury a limiting instruction. The trial court instructed the jury orally and in the charge that the hearsay was admitted only for the purpose of showing the basis of the expert's opinion and could not be considered as evidence to prove the truth of the matter asserted. Absent record evidence to the contrary, we presume the jury followed the court's limiting instructions. *See In re Commitment of Mares*, 521 S.W.3d at 71; *In re Commitment of Sawyer*, 2018 WL 3372924, at *6. Barnes does not assert there is anything in the record to show the jury ignored the court's instructions. Thus, we conclude the trial court did not

abuse its discretion in determining that the evidence was admissible and not unfairly prejudicial. We overrule Barnes's second issue.

In his third and fourth issues, Barnes contends the trial court committed reversible error when it admitted details of uncharged allegations on which Dunham relied in forming his opinion that Barnes suffers from a behavioral abnormality. When Dunham was asked how the allegations surfaced that led to his two convictions, Dunham answered that Barnes's son threatened to commit suicide after revealing that his father anally assaulted him for a period of three years. Dunham stated that Barnes's son later recanted the allegation. Dunham was not sure whether Barnes assaulted his son, but stated that if he did, it meant that Barnes assaulted male and female victims and "almost exhausted the target pool." Barnes objected to hearsay and also re-urged his motion in limine regarding unadjudicated offenses.

The trial court also permitted Dunham to testify about an uncharged and unadjudicated incident where Barnes was accused of exposing himself to a young girl as she sold jewelry door to door. Unlike the other allegations discussed at trial, this particular incident was not one that Barnes stipulated to when he pleaded guilty to his two convictions for aggravated sexual assault and admitted to assaulting other young girls that did not result in convictions. Dunham testified that the complainant may have been exaggerating and conceded he was "not sure that it happened." Nonetheless, Dunham found the incident of import because it showed that Barnes "got in trouble," yet acted out later on. Barnes objected to any mention of the allegation.

Again, we review a trial court's decision to admit evidence for an abuse of discretion. *See Service Corp. Int'l v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011); *In re Commitment of Mares*, 521 S.W.3d at 69. We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). In addition, we will not reverse a trial court for an erroneous evidentiary ruling unless the

error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1 (reversible error in civil cases). In assessing harm, we review the entire record and require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *See Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004); *In re Commitment of Romo*, No. 09–12–00598–CV, 2013 WL 5874615, at *3 (Tex. App.—Beaumont Oct. 31, 2013, no pet.) (mem. op.).

Assuming the trial court erred in admitting the objected-to evidence, we are not persuaded Barnes was harmed. Given the evidence in the record before us, the admissions from Barnes, his prior convictions, and the testimony from Dr. Dunham that Barnes suffers from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence, Barnes has not demonstrated that the trial court's judgment turns on the particular evidence about which he complains in issues three and four. Barnes has failed to demonstrate that the exclusion or admission of evidence in these issues probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1).

In addition, the trial court provided a limiting instruction to the jury which provided that, "Hearsay normally is not admissible at trial. However, certain hearsay information contained in records reviewed by the expert is allowed into evidence through expert testimony. Such evidence was admitted only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted." Barnes's counsel did not object further. "We must presume the jury followed the instruction; therefore, any potential harm arising from [the] testimony . . . was cured by the limiting instruction." *In re Commitment of Riojas*, No. 04-17-00082-CV, 2017 WL 4938818, at *6 (Tex. App.—San Antonio Nov. 1, 2017, no pet.) (mem. op.) (quoting *In re Commitment of Mares*, 521 S.W.3d at 71). We therefore overrule Barnes's third and fourth issues.

## CONCLUSION

Having overruled Barnes's issues on appeal, we affirm the trial court's judgment and order of commitment.

Rebeca C. Martinez, Justice