**Opinion issued December 5, 2017**



In The

# Court of Appeals

For The

# First District of Texas

———————————————

## NO. 01-17-00207-CV

———————————————

## IN RE COMMITMENT OF STONEY RAYMOND FONTENOT, Appellant

---

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Case No. 509155-0101Z**

---

## O P I N I O N

As appellant, Stoney Raymond Fontenot, neared the end of his confinement

for a 1989 sexual assault conviction, the State filed a petition to commit him civilly

as a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–

.151 (West 2017). After a jury found him to be a sexually violent predator, the trial

court signed a final judgment and order of civil commitment. In two issues, Fontenot

contends that (1) the State's questions directed to its mental health expert concerning the screening process an individual goes through before a sexually-violent-predator commitment trial constitutes fundamental error; and (2) the trial court committed fundamental error during voir dire when it made "misleading" statements concerning the role of the jury in the trial.

We affirm.

## Background

Fontenot pleaded guilty to the offense of rape in 1982, and the 262nd District Court of Harris County assessed his punishment at eight years' confinement. He was then convicted of sexual assault in 1989, and the 177th District Court of Harris County assessed his punishment at thirty years' confinement. In February 2016, as Fontenot neared the end of his sentence, the Special Prosecution Unit, acting with the Harris County District Attorney's Office, filed a petition in the 177th District Court alleging that Fontenot was a sexually violent predator and seeking to have him committed for treatment and supervision pursuant to Health and Safety Code Chapter 841. Specifically, the State alleged that Fontenot was a "repeat sexually violent offender who suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence."

The trial court began voir dire by explaining to the venire that this case was "a civil case with a criminal voir dire and a criminal jury charge." The trial court

explained that in 1999, the Texas Legislature enacted a statute concerning sexually

violent predators. The trial court stated:

> When someone in Mr. Fontenot's position is about to be released from prison, he then—if TDC feels it's appropriate, can file a lawsuit to say he needs—potentially needs additional treatment, outpatient sex offender type treatment. Okay.
>
> The statute is two-pronged. The first part is is he—this is what the Petitioner, the State has to prove to the jury—is he labeled what's, quote, "a sexually violent predator," which means does he have two or more prior convictions or probations, in certain combinations, either probations or trips to the penitentiary. There's different combinations of that. For our purposes here, it doesn't matter. But he has two qualifying prior type cases; and then, third, he has a behavioral abnormality that he still needs some sort of treatment for.
>
> So the Petitioner in this case, the State of Texas, that's what they have to prove.

Later, the trial court stated that the jury would have to decide one question:

whether Fontenot was a sexually violent predator. The court then stated that

Fontenot's prison sentence would not get any longer; instead, "It is an outpatient

treatment program. Think of it as a halfway house type situation." The court

repeatedly emphasized that Fontenot's prior convictions were not going to be

relitigated in this proceeding, but instead the question was, "what do we do going

forward," specifically, "yes or no does he need this continued care."

Several members of the venire expressed confusion regarding what the jury

would be asked to determine. The trial court had the following exchange with a

venireperson:

| | |
|---|---|
| Venireperson: | Are we just deciding does he get therapy after all this? Is that— |
| The Court: | So 17 asked a good question. What are we deciding? Does he get therapy? So here's what I can tell you. If the jury—well, the jury's going to answer, yes or no, does he meet the statutory criteria being a, quote, "sexually violent predator." Okay? From there it's up to the doctors to figure out what to do. My experience tells me—I don't know. |
| | Is it automatically statutory or is it depending on— |
| [The State]: | Your Honor, it's up to the Court to decide what actually happens afterwards. |
| The Court: | Okay. So then it's up to me to then figure out sort of what to do, what is the continuum of care. Is it a halfway house type situation? Is it a lockdown treatment program? It basically—if the jury says yes, it's up to me to take more—different information into account to figure out what is next. Kind of think of it as a—it's not probation and it's not parole, but it's kind of like that. |
| | Because here's the deal. Let's say this was a regular criminal case and a jury places someone on probation. The jury has no determination on what the programs are on probation. That's always up to the Court. So basically he remains under the Court's jurisdiction in some sort of treatment program up until he is either discharged from it or successfully completing it. Then there's also a process, he can petition to get out of it and different things like that. But more or less he stays under the jurisdiction of the Court going forward into the foreseeable future. |

The trial court then had another exchange with a different venireperson:

| | |
|---|---|
| Venireperson: | Are we here because the State says that he should have treatment and it's—he disagrees with it or |

4

| | whatever or is this standard protocol for anybody being released for whatever the offenses were listed? |
|---|---|
| The Court: | Good question. So, without getting too far into the weeds, Mr. Fontenot has—the State—the State of Texas—so this is a Prosecution Unit and—that deals with these types of cases. They have filed a petition. They believe that Mr. Fontenot needs this continuing care. |
| Venireperson: | And that's not necessarily standard for everybody in this situation? That's just—they're arbitrary decisions at this point? |
| The Court: | I wouldn't say—I wouldn't say arbitrary, but it's—I mean, it's not everybody, but it's—they've—they've chosen in this particular situation to follow this law. |
| Venireperson: | So it's not for every single person that's going to be released? |
| The Court: | Not necessarily. |

One venireperson stated, "So the petition is for more time, I guess." The trial court again clarified that Fontenot's prison sentence would not be extended but that there would be "some sort of after-care sex offender treatment that comes after [the prison sentence] that I decide on what exactly that is." This venireperson then stated that they did not think that "the jury should be deciding if he needs more" and that it would be a "mistake" to do so. Fontenot did not object to any of the trial court's comments during voir dire.[1]

---

[1] At the charge conference, Fontenot's counsel brought up this issue and stated that, during voir dire, "there was another question that was, in essence, this is a yes or

5

During its portion of voir dire, the State further explained the statutory elements that it was required to prove beyond a reasonable doubt. The State emphasized that it had to do more than prove that Fontenot had two prior sexual offenses—it also had to prove that Fontenot suffered from a behavioral abnormality. The State then asked the venire if anyone would make up their minds as soon as they heard evidence of two prior convictions. One venirepeson stated, "I feel like I've already made up my mind that he needs more therapy." Another venireperson agreed and stated, "I've already decided what needs to happen." The State then had the following exchange with a venireperson:

| | |
|---|---|
| Venireperson: | Basically you're going to prove this, but it's to determine if he needs more treatment once he's done with his current— |
| [The State]: | Essentially—essentially what happens after you determine whether yes or no really isn't a factor in answering the question. Right? While you may know that right now, it's really not a factor because what you need to know is whether or not I've proven those two things. Did—is he a repeat sexually violent offender? Does he have this condition that makes him more likely? What happens afterwards is really in the hands of the Judge. And so what really I need the 12 people that end up in the jury box, I need them to focus on the evidence that we're presenting. Right? I need you to focus on did she prove—did they prove he is a |

_____

no, does he need additional care which deflects the seriousness of the question." Counsel stated that he did not object at the time "simply because [he] did not want to overstep any grounds," but he believed that the error was fundamental and that "any taint in the jury would be incurable." He then asked for an instruction to disregard the statements.

repeat sexually violent offender. Did they prove he has a condition that makes him likely to do this behavior again?

That's what the 12 people that end up in the jury box needs to focus on. What happens afterwards is a matter of statute. Right? And so the Judge will decide that, and it really shouldn't be of concern to you.

When another venireperson asked if the jury would be determining whether Fontenot needs more treatment and whether it would hear whether he's already had treatment, the State responded, "There's a lot of evidence that will come in. You will hear a lot of evidence and I'm not allowed to preview any of that to you right now . . . ." Fontenot did not object to any of these statements by the prosecutor.

At trial, Dr. Jason Dunham, a forensic psychologist, testified that he assessed Fontenot in connection with the commitment proceeding. Dr. Dunham testified that, in his practice, he works for the Special Prosecution Unit, the State Counsel for Offenders, and the Texas Department of Criminal Justice "to evaluate people in the prison setting and what their risk is going forward when they're released." The State asked Dr. Dunham the following series of questions regarding the screening process under Health and Safety Code Chapter 841:

[The State]:     And so when you do the evaluations for the Texas Department of Criminal Justice, what is that process called?

[Dr. Dunham]:   An MDT evaluation is what we call it. There's a multidisciplinary treatment team within the prison system and they have the sex offender treatment

7

program within the prison system and so they hire or contract with certain psychologists to do their evaluations.

[The State]: And at that point are you the first psychologist to actually evaluate an offender for this process?

[Dr. Dunham]: Yes, I'm usually—the way I explain it to the offenders whenever I'm meeting with them—because I'm usually the first person that they're meeting with and sometimes it's a surprise and they don't know what's going on. And I explain to them that when people are in the prison system, if they have at least two sex offense—qualifying sex offense convictions, then they're flagged in the system for an evaluation. And it doesn't necessarily—at that point I don't think they're being discriminated or picked out. I think that they automatically receive that evaluation. That's what I've been told.

And so then at that point, I'm the first person to actually do this behavioral abnormality evaluation.

[The State]: And what is your understanding of how the process continues after your evaluation?

[Dr. Dunham]: So after the evaluation and once I submit my report, my understanding is that this multidisciplinary treatment team will take a look at my report. They will take a look at some other reports within their system, and they have to make a decision whether they're going to forward the case along to the Special Prosecution Unit—or maybe to the county now because I think that has changed a little bit—about whether they would recommend that the person be filed on for—for this process.

[The State]: And so if the case is then forwarded on to the county of last sexual conviction, how then are you involved in the case, if at all?

8

| [Dr. Dunham]: | If I have done the initial evaluation, then I'm usually contacted by the county or the Special Prosecution Unit and asked to—if I'd be willing to testify. |
| --- | --- |
| [The State]: | How many times have you then gone on to testify in a behavioral abnormality case? |
| [Dr. Dunham]: | I believe it was around 68 the last count. |

Fontenot did not object to this testimony.

Dr. Dunham also testified that he has done evaluations in which he has determined that the person does not have a behavioral abnormality, and when asked how often that has occurred, he responded that it depends on who has hired him. He estimated that he has done around 100 prison-based evaluations in which he is the first person to evaluate the individual, and around 60% of the time he has determined that the individual has a behavioral abnormality. He has also been hired to do a second opinion evaluation after another psychologist has done the initial evaluation, and he estimated that he agreed with the first opinion around 70 times and disagreed around 20 times. The State then asked:

| [The State]: | And so in that first step with the MDT board, it—you're making a determination, yes or no, whether or not he has a behavioral abnormality at that point? |
| --- | --- |
| [Dr. Dunham]: | Yes. |
| [The State]: | And then you're forwarding on the—then the MDT board forwards on the case depending on what their answer is? |
| [Dr. Dunham]: | Yes. |

| [The State]: | Okay. And then at that point it's possible for another psychologist or psychiatrist to evaluate the case and either decide yes or no at that point as well? |
|---|---|
| [Dr. Dunham]: | Yes. |
| [The State]: | Okay. Are—so the people that you generally see, these people typically have two convictions, at least two convictions for sexually violent offenses? |
| [Dr. Dunham]: | Yes. |

Fontenot also did not object to any of this testimony.

With respect to Fontenot's evaluation, Dr. Dunham opined that Fontenot suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Dr. Dunham testified that Fontenot had three sexually-related prior convictions, including one juvenile conviction for rape, and he discussed the circumstances and details of each of those offenses, two of which involved multiple acts of violence in addition to the sexual assault. Dr. Dunham stated that, in his interview with Fontenot, Fontenot consistently failed to accept responsibility for any of his three convictions and he blamed the victims and instead viewed himself as the victim. Dr. Dunham diagnosed Fontenot with sexual sadism, or "an extreme elevation of arousal to rape," and he stated that Fontenot was "sexually aroused by the violence and the humiliation that he was inflicting on the victims." Dr. Dunham opined that this condition is "currently active" for Fontenot, pointing out that he had 116 disciplinary cases while incarcerated and that 21 of those were sexual misconduct cases.

Dr. Dunham also diagnosed Fontenot with polysubstance abuse disorder, with a history of abusing marijuana and crack cocaine, antisocial personality disorder, and a high degree of psychopathy. Dr. Dunham opined that Fontenot was at a high risk to re-offend and commit another sex offense in the future, and he considered the biggest risk factor to be that Fontenot had been kicked out of a sex offender treatment program while incarcerated. Dr. Dunham concluded,

> I think that [Fontenot is] a sexual psychopath who was a higher risk when he entered prison the first time let alone the second time. So he's even higher risk when he entered prison this last time. . . . And I don't see what he's done to lower that risk any. I think his risk is only elevated since then. So I think that he's quite a high risk right now.

Fontenot testified that he was charged with aggravated rape when he was fifteen or sixteen years old and that he was sent to juvenile detention as a result of this charge. He testified that he was expelled from high school due to marijuana usage, that he continued to use marijuana while in prison, and that he sold marijuana while in prison. He also testified that, while he was incarcerated, he falsely reported to the prison psychiatric department that he was hearing auditory hallucinations, he falsely claimed that he was having suicidal thoughts, and he falsely requested medication for depression to get attention. Fontenot admitted having sex with the complainants in his two adult sexual assault convictions, but he stated that, on both occasions, the sex was consensual. Fontenot testified that he does not believe that he is a sex offender, that he does not have a problem with sex, that he does not need

11

sex offender treatment, and that he does not believe that he will ever sexually assault someone in the future. He stated that his plan upon release from prison was to move to Ohio, live with a friend of his, and get a job driving trucks or operating heavy equipment.

The jury charge defined "sexually violent predator" as a "repeat sexually violent offender" who "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." The charge also defined "repeat sexually violent offender," "behavioral abnormality," and "predatory act." The only question asked in the jury charge was: "Do you find beyond a reasonable doubt that STONEY RAYMOND FONTENOT is a sexually violent predator?" The jury answered "yes."

The trial court signed a final judgment declaring Fontenot to be a sexually violent predator and ordering him to be civilly committed upon his release from prison. The judgment ordered Fontenot to "continue in such commitment" until his behavioral abnormality has changed to the extent that he is no longer likely to engage in a predatory act of sexual violence. The trial court then signed an order of commitment requiring Fontenot, upon release from prison, among other things, to reside where instructed by the Texas Civil Commitment Office, to participate in the sex offender treatment program provided by the Office, and to submit to treatment and supervision administered by the Office. This order required the Office to

12

determine the conditions of supervision and treatment and provide supervision and treatment to Fontenot. The order also provided that a biennial review of Fontenot's commitment would occur in November 2018. This appeal followed.

**Fundamental Error**

In his first issue, Fontenot contends that the State's questioning of Dr. Dunham concerning the screening process and evaluations that a potential sexually-violent predator goes through before having a civil commitment trial constitutes fundamental error. In his second issue, Fontenot contends that the trial court committed fundamental error during voir dire by misleading the venire into believing that its role as jurors was to determine if he needed continuing outpatient care instead of indefinite confinement.

## A.    *Statutory Scheme: The Sexually Violent Predators Act*

In 1999, the Texas Legislature enacted the Sexually Violent Predators Act ("SVP Act"), finding that:

> [A] small but extremely dangerous group of sexually violent predators exists and . . . those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence. The legislature finds that the existing involuntary commitment provisions of [Texas Health and Safety Code] Subtitle C, Title 7, are inadequate to address the risk of repeated predatory behavior that sexually violent predators pose to society. The legislature further finds that treatment modalities for sexually violent predators are different from the traditional treatment modalities for persons appropriate for involuntary commitment under Subtitle C, Title 7. Thus, the legislature finds that a civil commitment procedure for the

13

> long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state.

TEX. HEALTH & SAFETY CODE ANN. § 841.001 (footnote omitted). The Legislature has defined "sexually violent predator" as a person who is a "repeat sexually violent offender" and who "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *Id.* § 841.003(a); *see id.* § 841.002(5) (defining "predatory act" as "an act directed toward individuals, including family members, for the primary purpose of victimization"). A person is a "repeat sexually violent predator" if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id.* § 841.003(b); *see id.* § 841.002(8) (defining "sexually violent offense" to include, among other things, offense of aggravated sexual assault as defined in Penal Code section 22.021). The Legislature further defined "behavioral abnormality" as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

The SVP Act provides that twenty-four months before a person's anticipated release date from confinement for a sexually violent offense, the Texas Department of Criminal Justice ("TDCJ") shall give written notice to a multidisciplinary team that the person is serving a sentence for a sexually violent offense and may be a

14

repeat sexually violent offender. *Id.* § 841.021(a)–(a-1); *see also id.* § 841.022(a) (providing that multidisciplinary team shall include professionals from several state agencies). Within sixty days after receiving the notice from TDCJ, the multidisciplinary team must assess whether the person is a repeat sexually violent offender and whether the person is likely to commit a sexually violent offense after release, give notice of the assessment to TDCJ, and recommend the assessment of the person for a behavioral abnormality, if appropriate. *Id.* § 841.022(c).

Within sixty days after receiving the recommendation of the multidisciplinary team, TDCJ shall assess whether the person suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence. *Id.* § 841.023(a). TDCJ shall use an expert to aid in the assessment, and the expert "shall make a clinical assessment based on testing for psychopathy, a clinical interview, and other appropriate assessments and techniques to aid [TDCJ] in its assessment." *Id.* If, following the assessment, TDCJ believes that the person suffers from a behavioral abnormality, TDCJ shall give notice of the assessment to the attorney representing the State for the county in which the person was most recently convicted of a sexually violent offense. *Id.* § 841.023(b).

Within ninety days after TDCJ refers the person to the State, the State's attorney may then file, in the court of conviction for the person's most recent sexually violent offense, a petition alleging that the person is a sexually violent

15

predator. *Id.* § 841.041. Within 270 days after the date the State serves the petition on the person, and before the person's discharge date from confinement, the trial court must conduct a trial to determine whether the person is a sexually violent predator. *Id.* § 841.061(a). A civil commitment proceeding "is subject to the rules of procedure and appeal for civil cases," but in the event of a conflict between Health and Safety Code Chapter 841 and the rules of procedure and appeal for civil cases, Chapter 841 controls. *Id.* § 841.146(b). Either party is entitled to request a jury trial. *Id.* § 841.061(b). Section 841.146 provides that Code of Criminal Procedure Chapter 33 governs "[t]he number and selection of jurors" in a civil commitment proceeding under the SVP Act. *Id.* § 841.146(a). The jury shall determine, beyond a reasonable doubt and by unanimous verdict, whether the person is a sexually violent predator. *Id.* § 841.062. If the jury determines that the person is a sexually violent predator, the trial court shall commit the person for treatment and supervision to be coordinated by the Civil Commitment Office.[2] *Id.* § 841.081(a).

---

[2]   The SVP Act also sets out requirements that the trial court must place on the person to ensure compliance with treatment and supervision and to protect the community, *see* TEX. HEALTH & SAFETY CODE ANN. § 841.082(a) (West 2017), provides requirements that the Civil Commitment Office must follow in delivering treatment and supervision, *see id.* §§ 841.081–.085 (West 2017), provides for biennial review of the commitment order, *see id.* §§ 841.101–.103 (West 2017), and provides procedures for a person to seek release from treatment and supervision, *see id.* §§ 841.121–.124 (West 2017).

**B.**      ***Preservation of Error and Fundamental Error in Civil Cases***

The Beaumont Court of Appeals has previously held that Health and Safety Code Chapter 841 "is a civil, not a criminal or quasi-criminal, statute." *In re Commitment of Martinez*, 98 S.W.3d 373, 375 (Tex. App.—Beaumont 2003, pet. denied). The court noted that the SVP Act affords persons "an array of protections, including counsel, experts, a jury trial, a beyond reasonable doubt burden of proof imposed on the State, and biennial reviews," but it also stated that "[i]nvoluntary civil commitment does not itself trigger the entire range of criminal protections." *Id.* at 376 (citing *Allen v. Illinois*, 478 U.S. 364, 372, 106 S. Ct. 2988, 2994 (1986)). The court concluded that "[t]he fact that Chapter 841 affords many of the procedural safeguards usually found in criminal trials does not transform the proceeding into a criminal or quasi-criminal proceeding." *Id.*

Because Chapter 841 is civil in nature, courts apply civil procedural rules and case law from the Texas Supreme Court—rather than the Court of Criminal Appeals—when addressing issues such as error preservation and fundamental error. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.146(b) (providing that, except in limited circumstances, civil commitment proceedings under Chapter 841 are "subject to the rules of procedure and appeal for civil cases"). Generally, to preserve error for appellate review, the complaining party must make his complaint to the trial court by a timely request, objection, or motion that states the grounds for the

17

ruling sought with sufficient specificity to make the trial court aware of the complaint. TEX. R. APP. P. 33.1(a)(1)(A). The Texas Supreme Court has held that "[r]equiring parties to raise complaints at trial conserves judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds." *In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003); *see Mansions in the Forest, L.P. v. Montgomery Cty.*, 365 S.W.3d 314, 317 (Tex. 2012) (per curiam). The supreme court has also held that preservation rules promote fairness among litigants, noting that parties should not be allowed to "waive, consent to, or neglect to complain about an error at trial and then surprise his opponent on appeal by stating his complaint for the first time." *In re B.L.D.*, 113 S.W.3d at 350 (quoting *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex. 1982) (per curiam)).

The Texas Supreme Court has recognized that the fundamental error doctrine is a limited exception to procedural preservation rules. *Id.* The court has noted, however, that "[i]n light of [its] strong policy considerations favoring preservation" of error, fundamental error in the civil context is a "discredited" doctrine. *Id.* (quoting *Cox v. Johnson*, 638 S.W.2d 867, 868 (Tex. 1982) (per curiam)). The fundamental error doctrine has been applied in civil proceedings only in "rare instances to review certain types of unpreserved or unassigned error." *Id.* Specifically, the court has reviewed unpreserved error "when the record shows on its face that the court lacked jurisdiction" and in "quasi-criminal" juvenile

18

delinquency proceedings involving certain types of error.[3]  *Id.* at 350–51 (citing cases involving failure to give mandatory statutory admonishments and constitutionality of burden of proof instruction in juvenile delinquency proceedings).

The Texas Supreme Court has also described fundamental error as "those instances in which error directly and adversely affects the interest of the public generally, as that interest is declared by the statutes or Constitution of our State," as well as "instances in which the record affirmatively and conclusively shows that the court rendering the judgment was without jurisdiction of the subject matter." *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 577 (Tex. 2006); *see also Mason v. Our Lady Star of Sea Catholic Church*, 154 S.W.3d 816, 821 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (noting that fundamental error doctrine is rarely used and that "courts have reserved their use of the doctrine for very narrow situations").

---

[3]     The Texas Supreme Court explained in *In re B.L.D.* that it considered juvenile delinquency cases to be "quasi-criminal" because, under the Family Code, the Texas Rules of Evidence applicable to criminal proceedings and Code of Criminal Procedure Chapter 38 governed juvenile delinquency cases.  *See* 113 S.W.3d 340, 351 (Tex. 2003).  It contrasted juvenile delinquency cases with parental-rights termination cases, at issue in *B.L.D.*, which were governed by the Rules of Evidence applicable to civil cases and the Rules of Civil Procedure.  *Id.*  Likewise, here, the SVP Act expressly provides that, with the exception of the number and selection of jurors, which is governed by Code of Criminal Procedure Chapter 33, commitment proceedings under the Act are "subject to the rules of procedure and appeal for civil cases."  *See* TEX. HEALTH & SAFETY CODE ANN. § 841.146(b) (West 2017).  This case, therefore, is a civil case.  *See In re Commitment of Stuteville*, 463 S.W.3d 543, 551 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (stating that proceedings under SVP Act are civil proceedings).

*C. Dr. Dunham's Testimony on SVP Screening Process*

Fontenot argues that the admission of Dr. Dunham's testimony relating to the SVP Screening Process—including the initial evaluation of the offender by the multidisciplinary team, the expert psychological evaluation of the offender, and the multidisciplinary team's decision to recommend civil commitment proceedings—constituted fundamental error. Specifically, Fontenot argues that this testimony was irrelevant and highly prejudicial because it "emphasized the import of TDCJ's whittling down process, letting the jury know that only those who TDCJ deems to be the worst of the worst ever make it to trial." He argues that this evidence "unfairly stacked the deck" against him and "prevented him from receiving a fair trial."

The State asked Dr. Dunham several questions concerning the SVP screening process. Dr. Dunham testified that the process begins with a multidisciplinary team automatically flagging prisoners with two qualifying sex offense convictions for an evaluation. The TDCJ contracts with a psychologist like Dr. Dunham to perform an evaluation to determine whether the prisoner has a behavioral abnormality. After Dr. Dunham completes the evaluation and submits his report, the multidisciplinary team reviews the report and other information at its disposal and decides whether to forward the case to the Special Prosecution Unit or the county. Dr. Dunham estimated that, in situations in which he performed the initial evaluation, he has found a behavioral abnormality in sixty cases and no behavioral abnormality in forty

cases. Dr. Dunham testified that he has also done second-opinion evaluations after another psychologist has found a behavioral abnormality, and he estimated that he agreed with the finding around seventy times and disagreed around twenty times. Fontenot did not object to any of this testimony.

Fontenot acknowledges that the Beaumont Court of Appeals has, on multiple occasions, held that expert testimony concerning the SVP screening process that an offender goes through prior to the commitment proceeding does not constitute fundamental error. *See In re Commitment of Mailhot*, No. 09-13-00270-CV, 2015 WL 182699, at *3 (Tex. App.—Beaumont Jan. 15, 2015, pet. denied) (mem. op.); *In re Commitment of Lemmons*, No. 09-13-00346-CV, 2014 WL 1400671, at *2 (Tex. App.—Beaumont Apr. 10, 2014, pet. denied) (mem. op.); *In re Commitment of King*, No. 09-13-00255-CV, 2014 WL 346109, at *5–6 (Tex. App.—Beaumont Jan. 23, 2014, no pet.) (mem. op.). In each of these cases, the Beaumont court held that the expert testimony concerning the SVP screening process did not fall within the "narrow scope of the 'fundamental error' doctrine recognized by the Texas Supreme Court." *See Mailhot*, 2015 WL 182699, at *3; *Lemmons*, 2014 WL 1400671, at *2; *King*, 2014 WL 346109, at *5. In each case, the court held that the offender was required to object on a timely basis to the expert testimony at trial in order to preserve the complaint concerning the propriety of the testimony for appellate review. *See, e.g.*, *King*, 2014 WL 346109, at *5 ("If King believed that

21

Dr. Self's testimony [concerning the SVP screening process] was incorrect, incomplete, or objectionable, King was required to object and bring it to the trial court's attention.").

Fontenot urges this Court not to follow this line of cases from the Beaumont Court of Appeals but, instead, to follow a 2006 decision by the Kansas Supreme Court concerning a prosecutor's discussion of the multiple levels of review prior to a commitment proceeding under Kansas's Sexually Violent Predators Act. *See In re Foster*, 127 P.3d 277 (Kan. 2006). In *Foster*, after the State filed a petition to declare Foster a sexually violent predator, the trial court held a hearing and found probable cause to believe that Foster met the sexually violent predator criteria. *Id.* at 280. At the commitment trial, the State mentioned the events leading up to the trial during opening statements, including informing the jury that a multidisciplinary team had reviewed Foster's records and made a determination concerning whether he was at risk to reoffend, that the team then passed the case on to a "prosecutor's committee" to make a determination based on records and psychologists' opinions, and that a judge then held a probable cause hearing to determine whether there was enough evidence to proceed under the Act. *Id.* One of the psychologists who examined Foster testified concerning the screening process that offenders undergo before a commitment proceeding. *Id.* at 281. During closing argument, the prosecutor stated, "[A]s I told you in my opening statement and as I think the

22

evidence has shown to you, this man has gone through many levels of reviews . . . ." *Id.* at 282 (emphasis omitted). Foster did not object at trial to any of these statements or evidence. *Id.* at 280–82.

On appeal, Foster argued that the State committed prosecutorial misconduct "by improperly commenting on the procedure leading up to the jury trial." *Id.* at 283. He argued that the State's comments during opening statements were improper because "before the jury ever heard any evidence, it was told that a judge, a team of prosecutors, and a committee of professionals decided that Foster should be prosecuted as a sexually violent predator." *Id.* The Kansas Supreme Court agreed with Foster that the case must be remanded, concluding that "the opening statement itself is sufficient to require reversal." *Id.* at 286. The court stated that the State had "no reason" to "mention the levels of review of the case that occurred before it was brought to this jury," noting that these statements, "stack[ed] the deck" against Foster. *Id.* The court further noted that a jury "has a natural tendency to look for guidance from those clothed in authority, *i.e.*, a multidisciplinary team of professionals, a team of prosecutors, and a district court judge, even when the guidance is not intended." *Id.* The court found "most troubling" the State's reference to the judge's prior probable cause determination, noting that this statement was damaging "because it expresse[d] judicial approval of the State's case." *Id.* at 287. The Kansas Supreme Court concluded that allowing the State to

23

mention during opening statements that "a multidisciplinary team of professionals, a team of prosecutors (including the attorney prosecuting the case), and the judge have all previously determined that sexually violent predator commitment proceedings should proceed against Foster is extremely prejudicial." *Id.* at 288. The court held that these statements were "inconsistent with substantial justice," affected Foster's substantial rights, and denied him his right to a fair trial. *Id.* The court prohibited "such statements by counsel and associated evidence" on retrial. *Id.*

The Beaumont Court of Appeals has previously addressed whether a defendant in a commitment proceeding under the Texas SVP Act may rely on *Foster* to argue that the admission of expert testimony concerning the SVP screening process is fundamental error and that the defendant may raise the complaint for the first time on appeal. *See King*, 2014 WL 346109, at *5 n.3. The Beaumont Court noted that *Foster* was factually distinguishable because it did not involve application of the Texas SVP statute and did not deal with "unobjected-to evidence from an expert," and it therefore refused to follow *Foster*. *Id.*; *see also In re Commitment of Slama*, No. 09-13-00497-CV, 2014 WL 6488943, at *5 (Tex. App.—Beaumont Nov. 20, 2014, no pet.) (mem. op.) (declining to revisit *King*'s holding deciding not to follow *Foster*).

In *Foster*, the Kansas Supreme Court expressly declined to "decide whether the unobjected-to evidence [concerning the screening process under the Kansas SVP

Act] and closing argument resulted in a denial of fundamental rights." *See* 127 P.3d at 286. Yet Fontenot urges us to follow *Foster* precisely on the issue of determining whether the admission of Dr. Dunham's testimony concerning the screening process under the Texas SVP Act constituted fundamental error. We decline to follow *Foster* for the reasons stated by the Beaumont court in *King*. *See* 2014 WL 346109, at *5 n.3. Furthermore, Fontenot cites to no Texas authority holding that admission of testimony such as Dr. Dunham's falls within the narrow scope of the "discredited" doctrine of fundamental error in civil cases. *See In re B.L.D.*, 113 S.W.3d at 350. We therefore decline Fontenot's invitation to depart from the Beaumont Court of Appeals' decisions holding that, to raise a complaint on appeal concerning the admission of evidence of the SVP screening process, the defendant must object at trial at the time the evidence is introduced. *See Mailhot*, 2015 WL 182699, at *3; *Lemmons*, 2014 WL 1400671, at *2; *King*, 2014 WL 346109, at *5.

We overrule Fontenot's first issue.

## D. *Trial Court's Comments During Voir Dire*

In his second issue, Fontenot argues that the trial court committed fundamental error during voir dire when, on several occasions, in an attempt to explain the nature of the proceeding to the venire, the court misled the venire into believing that its role was to determine whether Fontenot needed outpatient treatment, as opposed to indefinite confinement until he no longer presents a threat

25

to society. Fontenot argues that the trial court's statements to the venire that the jury would be determining if Fontenot needed additional treatment "detracted away from the seriousness of what the jury was there to determine by mistakenly stating that [Fontenot] would be in outpatient care." He argues that the jury should not have been made aware of the result of its answer to the jury question and that "the permeation of misinformation likely resulted in an improper judgment."

To preserve error, the complaining party must object to the trial court's allegedly improper conduct or comment when it occurs and request a curative instruction, unless the conduct or comment cannot be rendered harmless by a proper instruction. *In re Commitment of Stuteville*, 463 S.W.3d 543, 557 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *In re Commitment of VanZandt*, 156 S.W.3d 671, 674 (Tex. App.—Beaumont 2005, no pet.) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001)). "Unwaivable error must be of the type that 'cannot be repaired' and therefore needs no objection." *Stuteville*, 463 S.W.3d at 557 (quoting *Capellen v. Capellen*, 888 S.W.2d 539, 547 (Tex. App.—El Paso 1994, writ denied)). The complaining party bears the burden to explain how the trial court's comments were incurable or would excuse the party's failure to preserve error. *Id.* (quoting *Dow Chem. Co.*, 46 S.W.3d at 241).

Here, the trial court explained the nature of this proceeding on several occasions and repeatedly discussed the question that the jury would ultimately

answer. The court repeatedly stated that Fontenot's prison sentence would not be extended, but the jury would instead determine "what do we do going forward" and "yes or no does he need this continued care." At one point, the trial court stated, "It is an outpatient treatment program. Think of it as a halfway house type situation." Later during voir dire, the trial court clarified that the role of the jury was to determine whether Fontenot was a sexually violent predator and that the court would make the decision about further treatment. The State also emphasized that the jury would be determining whether Fontenot was a sexually violent predator and whether he has a condition that makes it likely for him to engage in sexually violent behavior again, and that what happens after that point is a "matter of statute" that the trial court will determine.

It is undisputed that Fontenot did not object to any of the trial court's statements during voir dire. Fontenot argues on appeal that the trial court's comments misled the venire concerning the jury's role in the proceeding and that this misinformation likely resulted in an improper judgment, but Fontenot has not attempted to explain how the trial court's allegedly improper comments could not have been cured by a proper instruction had he objected when the court made the comments. *See id.* (stating that complaining party bears burden to explain how trial court's comments were incurable such that party's failure to preserve error was excused). Because Fontenot has not demonstrated that the trial court's comments

were incurable, we hold that he has failed to preserve this complaint for appellate review and that he cannot raise this complaint for the first time on appeal. *See id.* at 558 (holding that because defendant had not explained how trial court's comments were so prejudicial that harm from comments could not be overcome by curative instruction, defendant failed to demonstrate comments were incurable and failed to preserve complaint for appellate review); *see also Dow Chem. Co.*, 46 S.W.3d at 241 (holding that appellate court erred in sustaining allegations of judicial bias arising out allegedly improper judicial comments because, among other reasons, "[n]either [the defendant] nor the court of appeals explain how any comments made by the trial judge were incurable or would excuse [the defendant's] failure to preserve error").

We overrule Fontenot's second issue.

## Conclusion

We affirm the judgment of the trial court.


Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

28